2007 WY 128

**In the Interest of FM:**

**BA, Appellant (Defendant),**

v.

**Laramie County Department of Family Services, Appellee (Plaintiff).**

**No. C–06–14.**

Supreme Court of Wyoming.

Aug. 8, 2007.

Representing Appellant: Karen Ashcraft Byrne, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General; Sue Chatfield, Senior Assistant Attorney General. Argument by Ms. Chatfield.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, JJ., and JAMES, D.J.

GOLDEN, Justice.

[¶ 1] BA (Mother) appeals the termination of her parental rights to FM, her biological son. Mother objects to the lack of

an appointment of a guardian ad litem (GAL) for FM in the termination proceeding. She also generally challenges the sufficiency of the evidence to support the termination. We reverse the order of the district court and remand this case with directions for the district court to dismiss the petition to terminate Mother's parental rights to FM.

## ISSUES

[¶ 2]   Mother presents the following issues for this Court's review:

I.   Did the lower court use an incorrect legal standard in making the decision to terminate BA's parental rights and base its decision on a misunderstanding of the consequences of its decision?

II.   Was it error not to consider appointing a guardian ad litem and compounding that error for Mr. Frentheway (whom the court thought had been appointed) to testify?

III.   Was insufficient evidence produced to legally support a termination of parental rights?

## FACTS[1]

[¶ 3]   Mother has three children—two girls and a son, FM. FM is the youngest and has a different father than the girls. FM's father is deceased. On the afternoon of September 1, 2002, a sheriff's deputy conducted a welfare check at Mother's home. He found the two girls, then ages thirteen and eleven, home alone in the house. FM, who was nine at the time, was at his grandmother's house. According to the deputy, Mother's house was "dirty," "there were a lot of dishes in the sink," and there "wasn't much food in the home." The deputy also found a glass pipe in the master bathroom, which he testified was consistent with methamphetamine use. The deputy determined that the children should be taken into protective custody and contacted a case worker with the Department of Family Services (DFS), who took physical custody of the children. Despite the fact that FM was not at the home but rather

with his grandmother, he was also taken into protective custody. A child protection proceeding was commenced with the filing of a neglect petition in juvenile court and physical custody of the children was placed judicially with the DFS. In June 2003 FM was placed with his paternal aunt and her family, where he has remained. By all accounts, FM's placement with his paternal aunt has been beneficial for him.

[¶ 4]   A case plan, dated December 2002, was developed by the DFS listing family reunification as the goal and establishing certain tasks for Mother to complete before Mother could be reunified with her children. The case plan did not contain any concurrent permanency goal. Specifically, the case plan did not inform Mother that her parental rights to her children might be terminated if she did not complete the tasks contained in the case plan.

[¶ 5]   Mother's compliance with the 2002 case plan was sketchy. Most critically, in February 2003, Mother was arrested for, and eventually convicted of, delivery and conspiracy to deliver methamphetamine. She was placed on probation and ordered to complete the Transitions Residential Program (TRP) as one of the conditions of her probation. Mother enrolled in the TRP program, but, in approximately November 2003, left the program because of a perceived lack of sincerity in her work. Mother immediately left the jurisdiction and was absent for approximately five months. During her absence, Mother sent cards and clothing to her children and called the DFS periodically. In May 2004 Mother returned and turned herself in to authorities. Mother's probation was revoked and a three to six year prison sentence was imposed. At the time of the termination trial, Mother was still incarcerated.

[¶ 6]   In the meantime, the child protection proceedings continued in juvenile court. The DFS case worker testified she first recommended terminating Mother's parental rights to FM to the juvenile court in October 2003. An order from a twelve month review dated October 2004 recites that the DFS

---

1.   In accord with our standard of review, our factual review is based upon evidence adduced at trial most favorable to the State.

recommended termination of Mother's parental rights to FM. In February 2005 Mother admitted the allegations set forth in the child protection neglect petition. The DFS did not develop a second case plan until June 2005. The second case plan states the permanency plan for FM was adoption and set Mother's task as voluntarily relinquishing her parental rights to FM. An order from a twelve month review dated January 2006 again recites that the DFS recommended termination of Mother's parental rights to FM.[2] This action for termination of Mother's parental rights to FM was finally filed on February 17, 2006, and the trial was held June 21, 2006.

## STANDARD OF REVIEW

### *Sufficiency of the Evidence*

[¶ 7] Although this Court strictly scrutinizes any proceeding terminating parental rights, we still apply our traditional principles of evidentiary review to Mother's challenge to the sufficiency of the evidence supporting termination of her parental rights. *CDB v. DJE*, 2005 WY 102, ¶ 4, 118 P.3d 439, 440 (Wyo.2005); *In re CC*, 2004 WY 167, ¶ 11, 102 P.3d 890, 894 (Wyo.2004); *Matter of SYM*, 924 P.2d 985, 987 (Wyo.1996). We examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. *In re MN*, 2003 WY 135, ¶ 5, 78 P.3d 232, 234 (Wyo. 2003). This Court then reviews the supporting evidence to ascertain if it clearly and convincingly establishes the statutory elements required to support termination. *In re IH*, 2001 WY 100, ¶ 14, 33 P.3d 172, 178 (Wyo.2001). Evidence is clear and convincing if it would persuade a trier of fact that the truth of the contention is highly probable. *Matter of GP*, 679 P.2d 976, 982 (Wyo.1984).

### *Statutory Construction*

[¶ 8] Mother's contention that the district court should have considered appointing a guardian ad litem for FM presents an issue of statutory construction. As always, this Court reviews issues of statutory construction de novo. *Layton v. State*, 2007 WY 1, ¶ 10, 150 P.3d 173, 176 (Wyo.2007).

## DISCUSSION

### *Sufficiency of the Evidence*

[¶ 9] Mother's Issues I and III both ultimately question the sufficiency of the evidence against her within the context of the appropriate standard of proof. The grounds for terminating parental rights must be established by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 768–70, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982); *In re A.D.*, 2007 WY 23, ¶ 9, 151 P.3d 1102, 1105 (Wyo.2007); *In re CS*, 2006 WY 130, ¶ 7, 143 P.3d 918, 921 (Wyo.2006). This is required because a parent's right to raise his or her children is an essential and basic civil right. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972). Parents have a "fundamental liberty interest" in the care, custody, and management of the child. *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394. It is "cardinal" that the custody, care and nurture of the child reside, first, in the parents. *H.L. v. Matheson*, 450 U.S. 398, 410, 101 S.Ct. 1164, 1172, 67 L.Ed.2d 388 (1981). A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child. *See Santosky*. Few forms of state action are so severe and so irreversible.

[¶ 10] In this case, the State sought termination of Mother's parental rights under the provisions of Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v) (LexisNexis 2007):

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

\* \* \* \*

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family

---

**2.** There is no evidence in the record that a multidisciplinary team was appointed in the juvenile court action. *See* Wyo. Stat. Ann. § 14-3-427(b) (LexisNexis 2007).

has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

\* \* \* \*

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

*Evidence supporting termination under Wyo. Stat. Ann. § 14–2–309(a)(iii)*

[¶ 11]   In this case, termination of Mother's parental rights pursuant to § 14–2–309(a)(iii) requires clear and convincing proof of three elements: (1) abusive treatment or neglect by the parent; (2) reasonable efforts by the DFS have been unsuccessful to rehabilitate the family; and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent. *In re A.D.*, ¶ 11, 151 P.3d at 1105; *RS v. Dep't of Family Servs.*, 2004 WY 87, ¶ 12, 94 P.3d 1025, 1028 (Wyo.2004).   It is the second element where the case for termination falls.

[¶ 12]   There are only two case plans in the record.   The first case plan, dated December 2002, lists reunification as the goal, with no mention of the possibility of termination of parental rights. The case plan not only contains tasks for Mother, but also tasks for the DFS to assist in the reunification process.   No evidence was introduced as to any services provided by the DFS to Mother with regards to finding housing, employment, or completing other tasks set out in the case plan.   By October 2003, however, the DFS was recommending to the juvenile court that

Mother's parental rights to FM be terminated.

[¶ 13]   Since no new case plan was developed, however, family reunification remained the permanency goal.   Certainly Mother's fleeing the state in November 2003 and ultimate incarceration made reunification efforts difficult, but not impossible.   Mother was out of the state for approximately five months but continued to maintain contact with the children.   She also attempted to maintain contact with FM after her incarceration. For the DFS's part, no evidence was presented as to what efforts, if any, the DFS took to facilitate communication between Mother and FM after she returned and was incarcerated.

[¶ 14]   Family reunification clearly was a difficult objective to achieve without contact between Mother and FM. As stated, there is no indication the DFS assisted with such communication.   FM's aunt testified that FM had very little contact with Mother.   His last visitation with Mother was sometime before February 2005.   Mother sent letters to FM almost monthly but it was FM's aunt, not the DFS, who decided the fate of the letters. FM's aunt allowed FM himself to determine whether he wanted to read the letters.   According to her, FM did not read the letters, nor did he write back. Finally, as of the second case plan dated June 2005, the DFS officially set the permanency goal for FM as adoption and the only task for Mother was to voluntarily relinquish her parental rights. Under the circumstances, even given Mother's incarceration, the State did not present clear and convincing evidence that the DFS provided reasonable efforts to reunify Mother with FM which were ultimately unsuccessful.[3]

---

**3.**   Compare the lack of evidence of reasonable efforts in this case with the evidence supporting reasonable efforts in *In re HP*, 2004 WY 82, ¶ 26, 93 P.3d 982, 990 (Wyo.2004):

The juvenile court's first finding is that there had been reasonable efforts to reunify the family.   *See* Wyo. Stat. Ann. § 14–3–431(c)(iv). We conclude that there was sufficient evidence for the juvenile court to make this determination.   Six MDT meetings were held to assess the case.   At each of these meetings the MDT encouraged Mother to complete her case plan and offered assistance.   The MDT wrote four

case plans for Mother that outlined the steps she would have to take to achieve reunification.   While Mother was incarcerated, the MDT tailored case plans to her situation.   DFS arranged overnight-unsupervised visits between the children's maternal grandmother and the children while Mother was incarcerated.   This allowed Mother visitation with her children because her mother took the children to the Women's Center twice a month.   Additionally, the MDT requested and the court appointed a CASA worker to facilitate providing services to Mother and the children.   Immedi-

*Evidence supporting termination under Wyo. Stat. Ann. § 14–2–309(a)(v)*

[¶ 15] There is no question that FM was in foster care for fifteen of the twenty-two months preceding the filing of the termination petition. The question is whether the State presented clear and convincing evidence that Mother was unfit to have custody and control of FM as of the time of the trial.[4]

[¶ 16] First, the district court found "the simple status of incarceration proves the absence of fitness as a parent." This finding is in error. The fact of incarceration, by itself, is not per se evidence of unfitness. *CDB*, ¶ 6, 118 P.3d at 441; *Matter of Adoption of JLP*, 774 P.2d 624, 630 (Wyo. 1989) ("incarceration alone is insufficient to establish unfitness"). The district court also erroneously relied on evidence relating to Mother's interaction with her daughters. It is Mother's relationship with FM that is at issue. It is not unusual for a parent to have different relationships with their individual children. FM has a different father, is the only boy, and is Mother's youngest child. Any of these factors, as well as individual personalities and characteristics, may cause Mother to interact with FM differently than she does her girls. We think it imprudent to rely on evidence of Mother's interaction with her girls as clear and convincing evidence of unfitness as a parent with regard to FM.

[¶ 17] In her favor, Mother did attempt to maintain contact with her children from the time they were removed from her home. While incarcerated, and prior to the termination trial, Mother completed a variety of courses including substance abuse education and treatment courses, parenting courses, employment courses, a keyboard course, and a critical thinking course. Mother participated in a 12–step program, narcotics anony-

mous and alcoholics anonymous. Although it is for the district court to evaluate Mother's credibility, we think it worth noting that Mother testified that she is not the same person she was three years ago. The classes she has taken in prison have given her better coping skills and parenting skills. She testified she has become more religious and upon her release she intends to

> get my stuff together. I want to move into a house. I want a relationship with my kids. I want to work. I want to go to church. I want to keep the friends I have now and work with them to make myself better for myself and my children.

Mother specifically mentioned her hope is to pursue a career as a medical transcriptionist.

[¶ 18] In terminating Mother's parental rights to FM the district court relied on all the evidence regarding Mother's history. It reasoned that Mother communicated to her children that they were not important to her by committing a crime and then running away upon her leaving the TRP program. The district court discounted Mother's personal work in prison because the certificates of completion provided to the court evidenced that Mother completed the courses after the petition to terminate her parental rights was filed.

[¶ 19] It is certainly appropriate for the district court to rely on the details of Mother's life as demonstrating a pattern. *A.D.*, ¶ 26, 151 P.3d at 1108 ("courts often consider the family's history over a long period of time in determining whether parental rights should be terminated"). Focus, however, should be maintained on Mother's current status.

[¶ 20] The only evidence of Mother's then current fitness was that she was in prison living a drug free life and trying to better

---

ately upon her release from the Women's Center, Mother was allowed visitation with the children, and the children were allowed to live with Mother within two weeks of her release. DFS offered Mother transportation to visitation, recommended Mother for counseling services, and assisted Mother in procuring suitable housing. It is true that the rehabilitative efforts after Mother was released from the Women's Center were short lived. However, over the course of the plan the above-noted

facts show that reasonable efforts were made to reunify the family.

4. There seems to be some confusion as to the time frame when a parent must be deemed unfit under the statute. The language of the statute, however, is very clear. It states there must be a finding "that the parent *is* unfit" (emphasis added). The statute unambiguously requires a finding of present unfitness.

herself as a person and as a parent. While we understand the district court's skepticism, even if Mother's testimony is not believed we find the State did not meet its burden of introducing clear and convincing evidence that Mother was currently unfit to have custody and control of FM.

[¶ 21] One of the primary problems in this case was that the State, instead of focusing on Mother, focused on the best interest of FM. Most witnesses called by the State only testified to how positive FM's placement with his aunt was and that his continued placement there was in FM's best interest. The most egregious example was John Frentheway who testified "this isn't about [Mother]. This isn't about how well she's developed." Mr. Frentheway opined that Mother's parental rights should be terminated even "[i]f she was the most perfect individual at this point." [5]

[¶ 22] Unfortunately, the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence. *See Santosky.* The United States Supreme Court has said: "[w]e have little doubt that the Due Process Clause would be offended 'if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978) (quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–863, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment)).

[¶ 23] We wish to make clear that, by this opinion, we are only deciding that clear and convincing evidence was not produced by the State to support the termination of Mother's parental rights to FM. FM will not be precipitously removed from his aunt's house as a result of this decision. FM's custody will be determined within the confines of the juvenile court action, as always.

[¶ 24] Even though FM does not now have the permanency that others wished for him, his future seems stable. Even Mother testified that she knew FM's placement with his aunt was in his best interest and she would not attempt to regain physical custody of him. Indeed, Mother was willing to sign any guardianship papers necessary to ensure FM remained with his aunt. Mother simply does not want her parental rights terminated. Mother is not completely in the clear, however. There is always the possibility of another petition for the termination of Mother's parental rights to FM should Mother's future behavior fall within the statutory grounds for termination.

### Issue II—Appointment of a Guardian Ad Litem

[¶ 25] While our reversal of the district court moots the need to discuss Mother's second issue regarding the lack of appointment of a guardian ad litem (GAL) for FM in this case, it raises a fundamental concern that is likely to arise again. The statute governing the appointment of a GAL for children in termination of parental rights actions is Wyo. Stat. Ann. § 14–2–312 (LexisNexis 2007), which in pertinent part reads:

After the petition has been filed, the court shall appoint a guardian ad litem to represent the child unless the court finds the interests of the child will be represented adequately by the petitioner or another party to the action and are not adverse to that party.

In this case no GAL was appointed to represent FM. The district court did not know of this until the trial.

[¶ 26] We believe the statute unambiguously calls for a very specific procedure. With an unambiguous statute, this Court ascertains legislative intent by giving effect to the plain and ordinary meaning of the words used. *Jenkins v. State, ex rel. Wyoming Workers' Safety and Comp. Div.,* 2007 WY 39, ¶ 6, 153 P.3d 271, 273 (Wyo.2007). The statute begins by stating that "the court *shall* appoint a guardian ad litem" (emphasis added). This mandates the court to appoint

---

5. Mother generally objects to the testimony of Mr. Frentheway on various grounds. In light of our reversal, we need not address Mother's objections.

a GAL when a petition is filed. The only exception to this requirement is if "the court finds the interests of the child will be represented adequately by the petitioner or another party to the action and are not adverse to that party." Therefore, in every termination case there must be an order either appointing a GAL or setting forth findings in accord with the statutory exception. We trust in the future district courts will be more attentive to following the mandates of this statute.

## CONCLUSION

[¶ 27] We understand that termination of parental rights is a sensitive and emotion-laden subject. We strongly believe that parents should not be given numerous chances after failing to adequately care for their children. The children are the victims in these situations and are being forced to suffer needlessly. Having children is not just a right, but a right with attendant responsibilities.

[¶ 28] However, parents facing the termination of their parental rights—fundamental constitutional rights—must be afforded every procedural and substantive protection the law allows. *See In re CC*, 2004 WY 167, ¶ 16, 102 P.3d 890, 895 (Wyo.2004). The district court was wrong to suggest that Mother should not be concerned that termination of her parental rights will "kill" her relationship with FM because all it was doing was "terminating the legal, technical relationship; the familial relationship, the mother/son relationship, will always be there." Termination of parental rights is the family law equivalent of the death penalty in a criminal case. As the evidence stands in this case, it is not clear that Mother's parental rights should be absolutely, permanently, terminated. The order of the district court terminating Mother's parental rights is reversed and this case is remanded with directions for the district court to dismiss the petition.