208 P.3d 1323 (2009)
2009 WY 78
In the Matter of the Termination of Parental Rights to AE and DE, Minor children:
JD and SE, Appellants (Respondents),
v.
State of Wyoming, Department of Family Services, Appellee (Petitioner).
No. S-08-0246.
Supreme Court of Wyoming.
June 15, 2009.
*1324 Representing Appellants: Jakob Norman and Jamie Woolsey, Center Street Law Offices, LLC, Casper, Wyoming; Hampton *1325 Young, Jr., Law Office of Hampton M. Young, Jr., PC, Casper, Wyoming. Argument by Ms. Woolsey and Mr. Young.
Representing Appellee: Bruce A. Salzburg, Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.
Guardian Ad Litem: Corinne A. Burke Miller, Corinne A. Miller Law Office, Casper, Wyoming.
Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.
BURKE, Justice.
[¶ 1] JD (Mother) and SE (Father) appeal from the district court's termination of their parental rights with their two minor children. We will affirm.

ISSUES
[¶ 2] Mother states two issues, which we have reworded slightly:
1. Did the State of Wyoming, Department of Family Services, establish by clear and convincing evidence that reasonable efforts were made to reunify the family, and that the health and safety of the children would be jeopardized by returning them to Mother?
2. Did the State of Wyoming, Department of Family Services, establish by clear and convincing evidence that Mother is an unfit parent?
Father raises essentially the same issues, though with regard to family reunification, he further asserts that DFS failed to follow applicable rules and statutes.

FACTS
[¶ 3] On April 5, 2005, DFS received an anonymous telephone call indicating that Mother and Father were selling drugs from their home. The caller also stated that the home was filthy, with dirty diapers spread around and spoiled food left on the living room floor and on the kitchen counters. DFS contacted the Casper Police Department, and requested a welfare check of the home.
[¶ 4] Upon arriving at the home, the police made contact with three adults, a three-year-old girl, and a two-year-old boy. Both children wore only diapers, and were described as being very dirty. In the home, a police officer observed dirty diapers, rotten food, and garbage strewn on the floors. The officer had trouble entering the children's bedroom because the doorknob was inoperable. Eventually getting the door open, he observed a single mattress with no bed frame, sheets, or bedding. The officer was struck with "a very intense odor," and observed fecal matter smeared on the mattress, walls, and furniture. The officer closed the door again because he "was actually about ready to vomit."
[¶ 5] In the parents' room, the officer observed blow torches lying on the bed, a bottle of weed killer on the dresser, and dirty clothes and garbage throughout the room. As the officer left the bedroom, Mother told him that he might find methamphetamine pipes under the bed. He asked for permission to search, and Mother consented. Under the bed, he found a metal box containing several glass methamphetamine pipes, and many small bags of a kind he knew were used to carry methamphetamine. Elsewhere in the house, he observed other chemicals and equipment of a kind used in manufacturing methamphetamine.
[¶ 6] At this point, the officer apparently made two decisions. First, he decided that the children should be taken into protective custody, and he called DFS for assistance with that. Second, he decided to call his sergeant to discuss arresting the adults in connection with the methamphetamine paraphernalia and precursor chemicals the officer had observed. While speaking to his sergeant, however, the police officer began to cough uncontrollably and vomit. The sergeant ordered the police officer to seek medical attention, and dispatched other law enforcement officials to the scene.
[¶ 7] Based on the police officer's request, a social worker from DFS arrived at the house to take custody of the children. She made similar observations of garbage, soiled diapers, and feces in the house, and of the *1326 children being dirty and unclothed. When the social worker asked for some clothing to take with the children, Mother placed some clothing in a plastic bag, but could not find shoes for the children. The clothing was later discarded because it was dirty and did not fit the children. The children, after being taken from the house, were delivered to a hospital for decontamination as the result of exposure to methamphetamine. Both children were found to be developmentally delayed. The younger child, for example, did not speak and could not use eating utensils. He also had respiratory and other medical problems.
[¶ 8] Following the search of the home, Mother and Father were arrested and charged with various crimes relating to the possession, manufacture, and delivery of methamphetamine. Their charges also related to manufacturing methamphetamine in the presence of the children. Pursuant to plea agreements, both parents were convicted on several charges. On January 4, 2006, Mother was sentenced on four counts, resulting in imprisonment for two to six years, and Father was sentenced on three counts, resulting in five to twelve years imprisonment.
[¶ 9] In the meantime, while the parents remained in custody, DFS filed a petition in the district court alleging child neglect, a claim later admitted by both Mother and Father. Acting on the petition, the district court ordered that the children be kept in the custody of DFS. Pursuant to the district court's order, DFS's multi-disciplinary team prepared a report on the children, recommending a case plan under which the parents would work toward reunification with the children. The parents agreed to the case plan in August 2005. The goal of the plan was family reunification or, failing that, placement of the children with relatives or other appropriate persons. The parents agreed that, once their criminal charges were resolved and they were out of jail, they would attend parenting classes, submit to urinalysis testing, and obtain suitable housing and employment. While the parents remained in jail, however, they were unable to perform the tasks called for in the case plan. Mother did write several letters to the children while she was incarcerated, and the children sent her letters and photographs. Father apparently wrote to the children only twice.
[¶ 10] After various status conferences and interim hearings, the district court convened a disposition hearing on January 12, 2006. Finding that the children had been in DFS custody for approximately nine months and that the parents were serving substantial prison sentences, the district court concluded that reunification of the family was no longer a realistic goal. It instead ordered a plan for termination of parental rights and adoption of the children. In response, DFS filed a petition for termination of parental rights on April 12, 2006. The hearing on this petition was not completed until March 31, 2008. The trial court concluded that DFS had established, by clear and convincing evidence, that Mother's and Father's parental rights should be terminated. Both parents have appealed the district court's termination of their parental rights.

STANDARD OF REVIEW
[¶ 11] The standard of review we employ when considering a termination of parental rights has been set forth and explained in previous cases:
The case for termination of parental rights must be made by clear and convincing evidence.... Because association with one's immediate family is a fundamental liberty interest, application of the "clear and convincing" standard to evidence supporting termination becomes the subject of strict scrutiny at the appellate level. Exacting though such scrutiny may be, we undertake examination of the evidence in a light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.
The fundamental nature of the parent-child relationship also leads to strict construction of applicable statutes against those seeking termination and in favor of the non-consenting parent. When, however, the language of a statute conveys a clear and definite meaning, we neither face the need nor acquire the license to construe that statute.
*1327 DKM v. RJS, 924 P.2d 985, 987 (Wyo.1996) (internal citations and emphasis omitted); see also SD v. Carbon County Dep't of Family Servs., 2002 WY 168, ¶ 6, 57 P.3d 1235, 1238 (Wyo.2002).

DISCUSSION
[¶ 12] We begin by narrowing the issues considered in this appeal. The applicable Wyoming statute sets forth seven different bases on which parental rights may be terminated. In this case, the district court concluded that the parental rights of Mother and Father should be terminated on three of these statutory bases:
(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications; ...
(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;
(iv) The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child;....
Wyo. Stat. Ann. § 14-2-309 (LexisNexis 2007). These bases are separate and "independent." DKM, 924 P.2d at 987. Accordingly, while DFS may seek to terminate parental rights on more than one basis, it need not prove more than one. "Proof of any one of those [bases] by clear and convincing evidence supports the termination of parental rights." SLJ v. Wyoming Dep't of Family Servs., 2005 WY 3, ¶ 32, 104 P.3d 74, 82 (2005).
[¶ 13] Subsection (i), quoted above, requires proof that the parent has not communicated with the children for a period of at least one year. The record before us reflects that Mother often wrote to her children, and received letters and photographs in return. On this basis, the district court declined to terminate her parental rights pursuant to subsection (i). However, the termination of her parental rights must still be affirmed if there was clear and convincing proof that Mother's rights should be terminated under another subsection of the statute.
[¶ 14] Subsection (iii), also quoted above, requires proof that "reasonable efforts ... have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment." In their appeals, Mother and Father devote substantial attention to arguments that DFS did not make reasonable efforts to rehabilitate the family. Father, in particular, asserts that DFS violated applicable statutory, regulatory, and policy requirements relating to rehabilitation efforts. DFS counters that its rehabilitation efforts were reasonable, though it admits that the incarceration of Mother and Father rendered such efforts more difficult.
[¶ 15] We note, however, that subsection (iii) of the statute is the only subsection that lists unsuccessful rehabilitation efforts as a requirement for terminating parental rights. "The remaining six subsections of § 14-2-309(a) do not require DFS to make rehabilitation efforts." SLJ, ¶ 32, 104 P.3d at 83. Accordingly, we need not consider the parents' arguments concerning rehabilitation efforts if there is another subsection of the statute under which their parental rights were properly terminated.
[¶ 16] We therefore focus this opinion on subsection (iv) of the statute, which provides that parental rights may be terminated upon clear and convincing proof that "[t]he parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child." It is undisputed that Mother and Father were incarcerated due to felony convictions. However, the fact of incarceration is, by itself, insufficient to establish that a person is unfit as a parent. In re *1328 JLP, 774 P.2d 624, 630 (Wyo.1989); In re FM, 2007 WY 128, ¶ 16, 163 P.3d 844, 849 (Wyo.2007). We must further consider whether DFS provided clear and convincing evidence that Mother and Father were unfit to have custody and control of the children.
[¶ 17] Mother and Father emphasize that, in the language of this statutory provision, the question is whether "the parent is unfit." The district court must consider the parents' fitness at the time of the hearing on the petition to terminate parental rights, because the "statute unambiguously requires a finding of present unfitness." FM, ¶ 15 n.4, 163 P.3d at 849 n. 4 (emphasis added). Both parents claim that DFS, the children's guardian ad litem, and the district court were unduly focused on evidence concerning their fitness as parents at the earlier time when the children were taken into custody by DFS and the parents were arrested.
[¶ 18] The parents are correct that the appropriate question is their fitness as parents at the time of the hearing. They stretch the argument too far, however, in asserting that evidence of their fitness at earlier times should be overlooked. By itself, such evidence may not be sufficient to justify the termination of parental rights. Evidence of past behavior is, however, plainly relevant in determining current parental fitness. As we noted in a previous case:
It is certainly appropriate for the district court to rely on the details of Mother's life as demonstrating a pattern. [In re] AD, [2007 WY 23,] ¶ 26, 151 P.3d [1102,] 1108 [(Wyo.2007)] ("courts often consider the family's history over a long period of time in determining whether parental rights should be terminated"). Focus, however, should be maintained on Mother's current status.
FM, ¶ 19, 163 P.3d at 849. Conforming to this precedent, we will first review evidence concerning Mother's and Father's past parenting behavior, then focus on more direct evidence of their fitness as parents at the time of the hearing.
[¶ 19] We have concluded that the evidence concerning their past parenting behavior demonstrates clearly and convincingly that Mother and Father were unfit. The evidence of record was aptly summarized by the district court in these findings of fact from its Judgment terminating the parental rights of Mother and Father:
6. On April 5, 2005, at approximately 5:00 p.m., at their residence, both [children] were exposed to substantial risks to their health and safety.
7. The substantial risks to the health and safety of [the children] referenced in paragraph 6 above, were apparent, obvious, and the responsibility of their parents.
8. The substantial risks to the health and safety of [the children] referenced in paragraphs 6 and 7 above, included the following conditions found upon the premises: dirty and cluttered rooms, rotting food, garbage, animal feces, fecal matter,... the presence of precursors to the manufacture of methamphetamine, the presence of methamphetamine pipes, a stench of feces, and an intense chemical odor.
9. The intense chemical odor referenced in paragraph 8 above, was of such nature and [e]ffect to make a police officer involved in the investigation of the premises ill.
10. The risk to the health and safety of the children referenced in paragraphs 6 and 7 above, was reflected in the children's physical conditions, with the children being dirty and not fully clothed.
11. The risk to the health and safety of the children referenced in paragraphs 6 and 7 above, also included significant conditions of concern to [the younger child's] health, including asthma, problems chewing, fine motor skill delays, speech delays, and developmental delays.
The district court further noted that Mother and Father had been convicted on charges that included the manufacture of methamphetamine in the presence of the children. Convictions for crimes involving harm to or endangerment of children are strongly indicative that the parents are unfit to have custody and control of their children. CDB v. DJE, 2005 WY 102, ¶ 7, 118 P.3d 439, 441 (Wyo.2005).
[¶ 20] We now shift our focus from the parents' past behavior to their status at the *1329 time of the hearing. The parents assert that, while incarcerated, they made efforts toward rehabilitation and improving their parenting skills. Both Mother and Father testified that they had completed parenting classes, attended drug addiction therapy sessions, and participated in other beneficial classes and programs. Mother was working toward her GED. Father was working toward an associate's degree in carpentry. In accordance with the applicable standard of review, however, we must discount this evidence somewhat because Mother and Father were the unsuccessful parties below. Unlike the district court, we have no opportunity to hear and observe the witnesses and determine what weight or significance the parents' testimony should be afforded.
[¶ 21] Examining the evidence in a light favorable to DFS, the prevailing party below, we find clear and convincing evidence that the parents' efforts yielded little progress in enhancing their fitness as parents. At the hearing, Mother testified that the younger child had suffered from extensive respiratory and other health problems since birth. Yet she also testified that she had never considered whether manufacturing methamphetamine in her home might cause difficulties for a child with respiratory problems. Asked why the children were dirty and dressed only in diapers, her response was that "they're typical little kids. They're not going to stay dressed." Questioned about the condition of the home, including the feces smeared throughout the children's bedroom, her response was that she "just didn't get up to clean the house that day."
Q. But in one day it gets that messy?
A. Well, I had my two kids, and ... when you've got two little toddlers, you know, they're going to destroy a house, you know. So, I mean, I was just letting them be typical little kids that day....
Q. So, clothes strewn everywhere; baked-on food in the kitchen; smell in the house; all that just happened in one day?
A. Yeah.
Q. Okay. And feces on the wall just happened that day?
A. Yeah, because I put [the children] in their room for a nap that day.
Q. You didn't happen to notice the smell?
A. Not until I got out of bed; no.
Father, when asked about the condition of the home, attempted to avoid responsibility by explaining that he "hadn't been home in probably four days."
[¶ 22] Based on this evidence, the guardian ad litem convincingly urges that the parents were clearly and convincingly shown to be unfit. The parents' responses to questioning, she says,
indicate that they have gained no insight into parenting and have not acquired the tools to parent. The parents appear completely oblivious to the responsibilities of parenting such as being home to parent, providing proper supervision, providing proper hygiene, teaching [the children] the simple task of wearing clothing or not smearing their feces on a bedroom wall. There was an utter lack of remorse, or contrition, [or] affirmation that ["]I have become a better parent and I will be a better parent to my children in the future.["]
Testimony by Mother and Father stands in contrast with that in FM, ¶ 17, 163 P.3d at 849, where we thought it "worth noting that Mother testified that she is not the same person she was three years ago. The classes she has taken in prison have given her better coping skills and parenting skills." Our review of the record reveals that neither Mother nor Father presented testimony or other evidence indicating that they had achieved any comparable changes or improvements.
[¶ 23] What the record does contain is proof that Mother and Father were incarcerated on felony charges relating to the endangerment of the children, evidence of their past parenting failures, and indications that their parenting skills have not improved since then. Together, this evidence provided the district court with clear and convincing proof that Mother and Father were incarcerated due to the conviction of a felony and, at the time of the hearing, were unfit to have custody or control of the children. Their parental rights were properly terminated pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iv), *1330 and we affirm the decision of the district court.