# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 50

### APRIL TERM, A.D. 2020

### April 15, 2020

IN THE MATTER OF THE TERMINATION OF
PARENTAL RIGHTS TO:  GGMC and CSC,
minor children,

JEREMY MICHAEL CLARK,

Appellant
(Respondent),

v.

STATE OF WYOMING, DEPARTMENT OF
FAMILY SERVICES,

Appellee
(Petitioner).

S-19-0181

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*
>    Timothy C. Kingston, Law Office of Tim Kingston, LLC, Foley, Alabama.  Argument by
>    Mr. Kingston.

*Representing Appellee:*
>    Bridget L. Hill, Attorney General; Misha Westby, Deputy Attorney General; Jill E.
>    Kucera, Senior Assistant Attorney General; Allison E. Connell, Assistant Attorney
>    General.  Argument by Ms. Connell.

*Guardians ad Litem:*
>    Dan S. Wilde, Deputy State Public Defender, Joseph R. Belcher, Chief Trial and
>    Appellate Counsel, and Hope M. Mead, Guardian ad Litem, Wyoming Guardian ad Litem
>    Program.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FOX, Justice.**

[¶1]   A jury concluded that clear and convincing evidence supported termination of Mr. Clark's parental rights to two of his children, C.C. and G.C.   Finding it in the children's best interests, the district court entered an order terminating his rights. Mr. Clark appeals, arguing that the district court erred in admitting evidence relating to C.C. and G.C.'s mother and half siblings and, without that evidence, that there was insufficient evidence to terminate his parental rights under Wyo. Stat. Ann. § 14-2-309 (LexisNexis 2019).   We affirm.

## ISSUES

[¶2]   We reframe the issues:

1. Was evidence concerning C.C. and G.C.'s half siblings admissible?

2. Was the evidence sufficient for the jury to conclude that Mr. Clark's parental rights could be terminated under Wyo. Stat. Ann. § 14-2-309(a)(iii) or (a)(v)?

## FACTS

[¶3]   Jeremy Clark and Kristen Saenz have three children together.   Two of their children, C.C. and G.C., are the subjects of this action.   On February 11, 2016, Officer Bonnee Bristow took days-old C.C. into protective custody because she tested positive for methamphetamine shortly after her birth.   Her test results indicated that Ms. Saenz had been using methamphetamine while pregnant.

[¶4]   Later that day, Officer Bristow performed a welfare check on Ms. Saenz's other children.   She determined that three of Ms. Saenz's children from a previous relationship (the D.M. children) were staying with their father and stepmother.   She located G.C. and Mr. Clark at the home Mr. Clark shared with Ms. Saenz.   She noticed that G.C. "had a lot of hair" that "was down below his ears."

[¶5]   About a week later, hair follicle samples were collected from the D.M. children, who had been living with Ms. Saenz and Mr. Clark shortly before going to visit their father.   It was not possible to collect a sample from G.C. because someone had shaved his head.   After the D.M. children's results came back positive for methamphetamine, Officer Bristow took them and G.C. into protective custody.   Mr. Clark claimed he had not known that Ms. Saenz was using drugs.

1

[¶6]   After the D.M. children, C.C., and G.C. were taken into protective custody, the Department of Family Services (the Department) developed a case plan to rehabilitate and reunify the Clark-Saenz family, including all five children.  Mr. Clark participated in developing the case plan, his case worker went through it with him "word by word" to make sure he understood it, and Mr. Clark signed it.  The plan required Mr. Clark to "be a sober caregiver, to address mental health concerns, be financially stable, abide by the law, to ensure that the children had their medical [and] daily needs met," and to attend "parenting education."  It identified steps for Mr. Clark to take in order to meet these goals, including: weekly random drug testing; providing the Department with documentation that the children were current on medical checkups and immunizations; completion of substance abuse and mental health evaluations and compliance with recommendations made in those evaluations; completion of an anger management program; completion of a parenting education program; development of a financial stability plan; and demonstration of appropriate parenting skills during visitation with the children.  The Department arranged supervised visits for Mr. Clark and transported C.C., G.C., and the D.M. children to the visits as needed; referred Mr. Clark to a drug testing center and paid for his drug tests; made referrals to Peak Wellness for parenting classes and mental health and substance abuse evaluations; and conducted multidisciplinary team meetings to discuss Mr. Clark and the children's progress under the case plan.

[¶7]   Initially, Mr. Clark was "fairly consistent" in complying with the plan.  He attended supervised visits with the children, submitted to two drug tests with negative results, and completed substance abuse and mental health evaluations.  However, in November 2016 the Department informed Mr. Clark that he would have to provide negative drug tests before every supervised visit because there were "concerns that maybe he was attending the visits while under the influence of something."  Shortly afterwards, Mr. Clark stopped attending supervised visits and fell out of contact with the Department.  He stopped attending drug tests, and he failed to complete any of the treatment recommended in his substance abuse and mental health evaluations.  The Department continued to make visitation and drug testing available and attempted to notify Mr. Clark about scheduled multidisciplinary team meetings and court hearings.  Mr. Clark did not attend any of these.

[¶8]   The juvenile court held a permanency hearing in April 2017, and the Department recommended that the permanency plan be changed to adoption, "[g]iven the children's age, their need for permanency, and the lack of progress on the case plan to resolve the initial safety concerns."  The court took the Department's recommendation under advisement, and the Department continued attempting to contact Mr. Clark and to make services available to him.  In July 2017, the juvenile court relieved the Department of further reunification efforts with Mr. Clark.

[¶9]   In November 2017, Mr. Clark contacted the Department and asked "what he needed to do in order to get the children back."  The Department informed him that it had

been relieved of reunification efforts, so it could no longer pay for drug testing, but that it "was happy to help him find services and take documentation of anything he wanted to provide[.]" In 2018, Mr. Clark completed a parenting education course and provided the Department documentation of several negative drug test results.

[¶10] In June 2018, the Department filed a petition for termination of Mr. Clark's parental rights in district court. Before trial, Mr. Clark filed a motion in limine that sought to exclude cumulative and irrelevant evidence. Specifically, Mr. Clark sought to exclude evidence concerning a prior juvenile court action involving the D.M. children and Ms. Saenz, and other evidence related to Ms. Saenz's substance abuse and her neglect of the D.M. children. Mr. Clark asserted that this evidence was cumulative and irrelevant because Ms. Saenz was not a party to the termination proceeding and because he was not a biological parent to the D.M. children. The district court reserved ruling on the challenged evidence, stating that those matters would have to be addressed as they arose at trial.

[¶11] At trial, the State presented evidence of the previous juvenile court action involving Ms. Saenz and the D.M. children. Although that matter did not concern C.C. or G.C. and Mr. Clark was not a party, he was involved because of his relationship with Ms. Saenz and the D.M. children. Jennifer Dockter, a former Department social services worker, testified that she met Mr. Clark while working the D.M. children's case because he had been living with Ms. Saenz and the D.M. children. Mr. Clark was present during most home visits, and was there at the time of an incident in which one of the toddler-age children was found "unsupervised, walking around the neighborhood, and had been missing for . . . over an hour." Ms. Dockter testified that there had been four or five other incidents involving "supervision issues" during that time that resulted in law enforcement contacts and police reports. She also testified that the Department investigated allegations that Mr. Clark had spanked one of the D.M. children, leaving marks. The Department recommended that Mr. Clark get a substance abuse evaluation because it had received reports about him being arrested with drug paraphernalia and was concerned about him "continually being around [Ms. Saenz]" and her children. In October 2013, the juvenile court ordered that the D.M. children have no contact with Mr. Clark. Eventually, however, Ms. Saenz regained custody of the D.M. children, and their contact with Mr. Clark resumed.

[¶12] Tasha Marshall, the kindergarten teacher to two of the D.M. children during the 2015 to 2016 school year, also testified. Mr. Clark lived with Ms. Saenz and the D.M. children during that period. Ms. Marshall testified that the D.M. children "were frequently late to school," "would come without being fed breakfast," and were often sleepy to the degree that the "littlest boy would fall asleep in class." She testified that the D.M. children had various "behavior issues," that they were "wearing the same clothes sometimes," and that she could "tell that they weren't clean." She noticed that the

3

children began to improve when they were removed from Ms. Saenz and Mr. Clark's home after C.C. was born.

[¶13] The State also introduced evidence concerning Mr. Clark's criminal history and his history of substance abuse. Officer Greg Hutchinson testified about an incident in July 2013 during which Mr. Clark was arrested for shoplifting and possession of a controlled substance (methamphetamine). A therapist at Specialty Counseling and Consulting testified that she evaluated Mr. Clark in December 2017 after a referral from the Department. Mr. Clark admitted to her that he "relapsed on drugs" shortly before ceasing contact with the Department in November 2016. Beth Chalstrom testified that she became Mr. Clark's probation and parole officer in October 2018 after he was convicted of receiving stolen property in an amount greater than $1,000. Mr. Clark admitted to her that he used methamphetamine in December 2018. Ms. Chalstrom also testified that Mr. Clark had lied about participating in counseling, a condition of his probation.

[¶14] The State also introduced evidence directly related to C.C. and G.C. and the juvenile case that led to these termination proceedings. Doctor Ronald Malm testified about C.C.'s positive drug test results indicating that Ms. Saenz had used methamphetamine while pregnant. A supervised visit coordinator who provided visitation services to the Clark-Saenz family testified that she observed Mr. Clark during supervised visits and noticed that "[s]ometimes his hands were shaky," that he had a "dull stare," and that his interactions with the children were "limited."

[¶15] Eileen Gavagan, C.C. and G.C.'s therapist, testified that she had diagnosed both children with adjustment disorder, noting that they were very anxious and prone to "extreme emotional outbursts." She also noted that between the winter of 2016 and October 2018 when she treated C.C. and G.C., Mr. Clark was aware that she was providing therapy to them, but he never attempted to discuss their progress with her and appeared to be "checked out" at multidisciplinary team meetings he attended. She believed that C.C. and G.C. needed "a very structured environment" and "would expect to see a lot of regression" without it. She recommended that C.C. and G.C. not be returned to Mr. Clark's care.

[¶16] Brittney Thaler, a social services worker with the Department, testified about Mr. Clark's lack of progress on the case plan. She also testified about an incident where G.C. burned his leg on a heater and Mr. Clark failed to get him medical care, resulting in a "deep scar." She did not believe the Department could return C.C. and G.C. to Mr. Clark because she continued "to have concerns about his sobriety and their safety in relation to his substance use."

[¶17] Ms. Saenz also testified. She stated that she ended her relationship with Mr. Clark around December 2018 because she thought he might be using drugs again. She testified

that she and Mr. Clark used methamphetamine together while the D.M. children were living with them, but before C.C. and G.C. were born. They also used methamphetamine together "maybe a couple of times" between 2014 and 2016. She believed that Mr. Clark had been using methamphetamine in 2016 before he stopped working on the case plan and left town. When asked whether she had used methamphetamine while pregnant with C.C., Ms. Saenz invoked her Fifth Amendment right against self-incrimination. The district court instructed the jury that "when a witness asserts the Fifth Amendment privilege, which they certainly have a right to do under our Constitution, you may in a civil case draw an adverse inference from that assertion of the right."

[¶18] Mr. Clark presented evidence that he had been a loving father to C.C. and G.C. and that he had attempted to comply with the case plan in order to regain custody of them and the D.M. children, whom he considered to be his own. He testified about a three-month period when Ms. Saenz was in jail and he cared for G.C. on his own, stating that he fed him, changed his diapers, kept him healthy, and developed a bond with him. He said that when Ms. Saenz was released, he agreed to let her and the D.M. children move back in with him because she promised to stay clean. He claimed that, had he known she was using drugs again, he "would have kicked her out. It would have been over with." He believed he provided his children a safe and stable living environment, saying "I provided a roof over their head. I did the best I could do." He denied knowing that Ms. Saenz had been using methamphetamine while pregnant with C.C.

[¶19] However, Mr. Clark acknowledged that he had struggled with substance abuse for many years and admitted to using methamphetamine during the summer of 2016 and in December 2018. He acknowledged that he had never attended any substance abuse treatment. He also testified that G.C. did not receive any medical care, including checkups or immunizations, between the time he was one month old and when the Department took him into protective custody, at about one and one-half years old. He explained that he "thought [Ms. Saenz] was doing it the whole time." He acknowledged that he made no attempt to comply with his case plan between November 2016 and November 2017, explaining that he left town because he "felt it was [Ms. Saenz's] fault that [C.C. and G.C.] got taken" so "[s]he should be the one to get them back" and that the Department "had it out" for him. Although Mr. Clark presented evidence of some clean drug tests after he returned in late 2017[1] and asserted that he "did everything on my case plan that [the Department] wanted [him] to do," he admitted that he had never scheduled any doctor appointments for his children, did not follow through with the recommendations of his substance abuse and mental health evaluations, did not create a financial stability plan, and did not complete an anger management course.

---

[1] Mr. Clark paid for and submitted to these drug tests voluntarily until they became a condition of his probation after his conviction for receipt of stolen property.

5

[¶20] The jury concluded that clear and convincing evidence supported termination of Mr. Clark's parental rights on two grounds: 1) that C.C. and G.C. had been abused or neglected by Mr. Clark and the Department's reasonable efforts had been unsuccessful in rehabilitating the family, such that their health and safety would be seriously jeopardized if returned to his care, Wyo. Stat. Ann. § 14-2-309(a)(iii); and 2) that C.C. and G.C. had been in the State's custody for 15 of the most recent 22 months and that Mr. Clark was unfit to have custody and control of the children, Wyo. Stat. Ann. § 14-2-309(a)(v). Finding it in C.C. and G.C.'s best interests, the district court entered an order terminating Mr. Clark's parental rights. Mr. Clark timely appealed.

## *STANDARD OF REVIEW*

[¶21] Mr. Clark argues the testimony of several witnesses was inadmissible because evidence that Ms. Saenz had neglected the D.M. children was not relevant to whether his parental rights to G.C. and C.C. should be terminated and, alternatively, that it was excessively prejudicial. He claims that, without it, there was insufficient evidence to terminate his parental rights. The Department asserts that Mr. Clark failed to object to the testimony of Officer Bristow, Ms. Saenz, and Ms. Gavagan at trial and that Mr. Clark has therefore waived the argument that their testimony was irrelevant. However, our review of the record reveals relevance objections to exhibits introduced through Officer Bristow's testimony. We review challenges to the admission of evidence for an abuse of discretion when the party challenging the evidence objected to it in the lower court. *In re GAC*, 2017 WY 65, ¶ 32, 396 P.3d 411, 419 (Wyo. 2017). We therefore afford considerable deference to our review of the testimony of Officer Bristow and several other witnesses,[2] "and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion." *Id.* (quoting *Wise v. Ludlow*, 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo. 2015)).

[¶22] As to Ms. Saenz and Ms. Gavagan, Mr. Clark's argument concerning their testimony appears to be aimed at attacking the sufficiency of the evidence, and we will examine it in that light. We review whether there was sufficient evidence to terminate Mr. Clark's parental rights as follows:

> We apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. We examine the evidence in the light

---

[2] Mr. Clark also challenges the testimony of Ms. Dockter, Officer Hutchinson, Dr. Malm, and Ms. Marshall on relevance grounds. Mr. Clark sought to exclude their testimony in his motion in limine and objected to their testimony at trial. The Department does not dispute that the testimony of these witnesses should be reviewed for an abuse of discretion.

most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. This Court then reviews the supporting evidence to ascertain if it clearly and convincingly satisfies the statutory elements required to support termination. Evidence is clear and convincing if it would persuade a trier of fact that the truth of the contention is highly probable. This Court may examine all of the properly admissible evidence in the record, but we do not reweigh the evidence. In applying our standard of review, we keep in mind that the right to associate with one's family is fundamental and strictly scrutinize petitions to terminate parental rights.

*In re WDW*, 2010 WY 9, ¶ 17, 224 P.3d 14, 19 (Wyo. 2010) (internal citations omitted).

## *DISCUSSION*

[¶23] The jury found clear and convincing evidence to terminate Mr. Clark's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v); however, we need only determine whether sufficient evidence supported one of the bases for termination. *Id.* We review whether there was sufficient admissible evidence to terminate Mr. Clark's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(v), which requires clear and convincing evidence that: "The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]" The parties do not dispute, and the record clearly reflects, that the Department had custody of C.C. and G.C. for 15 of the most recent 22 months preceding trial. Thus, we consider whether the challenged evidence was admissible and, in conjunction with other evidence, sufficient to show unfitness.

## I.     *Evidence concerning C.C. and G.C.'s half siblings was admissible*

[¶24] Evidence must be relevant to be admissible. *Hill v. State*, 2016 WY 27, ¶ 29, 371 P.3d 553, 562 (Wyo. 2016). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence[.]'" *Id.* (quoting *Thomas v. State*, 2006 WY 34, ¶ 28, 131 P.3d 348, 356 (Wyo. 2006)). In a termination of parental rights proceeding, evidence that tends to prove or disprove one of the statutory elements required to support termination is relevant. *See Hill*, 2016 WY 27, ¶ 30, 371 P.3d at 562 ("In criminal cases, evidence is always relevant if it tends to prove or disprove one of the elements of the crime charged."). However, even relevant evidence may be excluded if "'its probative value is substantially outweighed by the danger of

unfair prejudice.'" *Id.* at ¶ 29, 371 P.3d at 562 (quoting *Thomas*, 2006 WY 34, ¶ 28, 131 P.3d at 356); W.R.E. 403.

[¶25]   Section 14-2-309 does not define the term "unfit," but we have stated that:

> Fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child.  Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child.

*In re BAD*, 2019 WY 83, ¶ 16, 446 P.3d 222, 226 (Wyo. 2019) (quoting *In re KMJ*, 2010 WY 142, ¶ 15, 242 P.3d 968, 971 (Wyo. 2010)).  A variety of factors, incidents, and conditions can demonstrate a parent's unfitness, and "[r]arely do we find a single condition or incident that, standing alone, would justify termination."  *In re BAD*, 2019 WY 83, ¶ 16, 446 P.3d at 226 (quoting *In re AD*, 2007 WY 23, ¶ 26, 151 P.3d 1102, 1108-09 (Wyo. 2007)).  Instead, we consider "numerous incidents and conditions extending over a considerable length of time."  *In re BAD*, 2019 WY 83, ¶ 16, 446 P.3d at 226.  Such factors might include:

> 1) inability to assist with therapy and recovery of a child with significant mental health needs; 2) lack of contact with and expressed lack of desire to take custody of the child; 3) contribution to the child's mental health or behavioral problems; 4) unstable living situation relating to employment or maintenance of a suitable home; 5) criminal record, particularly one primarily related to drug use, or a pattern of ongoing drug use; 6) failure to take responsibility for past conduct; 7) lack of emotional bond with the child; 8) failure to develop child-rearing skills; 9) convictions for crimes involving a potential for harming the child; 10) inability to monitor or make healthy nutritional choices or to provide a safe environment; 11) a history of surrounding [oneself] and the children with unsafe individuals; and 12) the child has become upset by or resistant to visitation with the parent.

*Id.* at ¶ 24, 446 P.3d at 228 (quoting *LeBlanc v. State Dep't of Family Servs.*, 2017 WY 107, ¶ 23, 401 P.3d 932, 936 (Wyo. 2017)).  It is well settled that a parent's fitness must be determined as of the time of the termination proceedings.  *In re KGS*, 2017 WY 2, ¶ 16, 386 P.3d 1144, 1147 (Wyo. 2017) (citing *In re KMJ*, 2010 WY 142, ¶ 17, 242 P.3d at 971).  "That does not mean, however, that the district court must ignore evidence of a parent's previous unfitness."  *In re KGS*, 2017 WY 2, ¶ 16, 386 P.3d at 1147.  "It is

appropriate for a district court to consider a parent's history and pattern of behavior over time in determining whether rights should be terminated." *In re WDW*, 2010 WY 9, ¶ 24, 224 P.3d at 20. "Evidence of past behavior is 'plainly relevant in determining current parental fitness.'" *In re KGS*, 2017 WY 2, ¶ 16, 386 P.3d at 1147 (quoting *In re AE*, 2009 WY 78, ¶ 18, 208 P.3d 1323, 1328 (Wyo. 2009)).

[¶26] Evidence concerning Mr. Clark's past behavior, his relationship with Ms. Saenz, and his relationship with the D.M. children was relevant to the question of whether Mr. Clark was currently fit to parent C.C. and G.C. The State presented evidence that Mr. Clark resided with Ms. Saenz and the D.M. children while there were concerns about the lack of supervision over the children. During that time, the Department also raised concerns about Mr. Clark abusing substances and the effect it might have on the D.M. children. He and G.C. also lived with them during the period when they were showing up to school late, unfed, and unclean. The D.M. children also tested positive for methamphetamine while they were living with Ms. Saenz, Mr. Clark, and G.C. That evidence certainly had some relevance to Mr. Clark's ability to provide a stable and safe home environment and to ensure that the needs of children living in his home were met.

[¶27] Further, Mr. Clark has failed to demonstrate that this evidence had little or no probative value or that it tempted the jury to decide the case on an improper basis. *Carrier v. State*, 2017 WY 88, ¶ 21, 400 P.3d 358, 364 (Wyo. 2017) ("For this court to conclude that the trial court admitted unduly prejudicial evidence in violation of W.R.E. 403, the appellant must demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury."); *Garrison v. State*, 2018 WY 9, ¶ 31, 409 P.3d 1209, 1218 (Wyo. 2018) ("Evidence is unfairly prejudicial if it tempts the jury to decide the case on an improper basis."). Mr. Clark asserts that the Department's "strategy was to show the jury that <u>Saenz</u> was a bad mother, that <u>she</u> neglected and abused her children" and used this evidence to show his "guilt by association." (Emphasis in original.) We disagree. The evidence assisted the jury in understanding Mr. Clark's history and pattern of behavior, a matter that was "plainly relevant in determining [his] current parental fitness." *In re KGS*, 2017 WY 2, ¶ 16, 386 P.3d at 1147 (citation omitted).

[¶28] That is not to say that the Department is relieved of its burden to make a showing of current unfitness in relation to the children at issue in the termination proceedings. In *In re FM*, we stated that the district court erroneously relied on a mother's interaction with her daughters, who were not the subject of the termination proceedings, in concluding that the mother was unfit. 2007 WY 128, ¶ 16, 163 P.3d 844, 849 (Wyo. 2007). We reasoned that "[i]t is not unusual for a parent to have different relationships with their individual children" and noted some factors that made the mother's relationship with her daughters distinct from her relationship with F.M., the child at issue. *Id.* We concluded it was "imprudent to rely on evidence of Mother's interaction with her girls as clear and convincing evidence of unfitness as a parent with regard to FM." *Id.*

[¶29] We did not state, however, that the evidence related to the mother's daughters was entirely irrelevant. Our concern about reliance on evidence of the mother's relationship with her daughters arose from the fact that there was scant other evidence showing mother's unfitness. In *FM*, the district court relied exclusively on mother's incarceration and her relationship with her daughters to show the mother's unfitness. *Id.* at ¶¶ 16-21, 163 P.3d at 849-50. "The fact of incarceration, by itself, is not per se evidence of unfitness." *Id.* at ¶ 16, 163 P.3d at 849. Thus, we held that, while it was "certainly appropriate for the district court to rely on the details of Mother's life as demonstrating a pattern," there was insufficient evidence to terminate her parental rights because "[t]he only evidence of Mother's then current fitness was that she was in prison[.]" *Id.* at ¶¶ 19-20, 163 P.3d at 849. In other words, the evidence introduced in *FM* was insufficient to show unfitness, but it was not irrelevant. The same is true here—although relevant, had the Department introduced evidence solely related to the D.M. children, it might not have carried its burden. That is not what occurred.

## II.     The evidence was sufficient for the jury to conclude that Mr. Clark's parental rights could be terminated under Wyo. Stat. Ann. § 14-2-309

[¶30] In addition to evidence about the D.M. children, the Department introduced Mr. Clark's history of substance abuse, raising the inference that he participated in exposing C.C. and G.C. to methamphetamine. There was evidence that Mr. Clark had used methamphetamine for many years, sometimes while there were children in the home, and not infrequently with Ms. Saenz. There was also evidence that someone had shaved G.C.'s head, preventing hair follicle testing. The shaving occurred shortly after Mr. Clark was informed that C.C. had been taken into protective custody because of her positive drug test, while G.C. was in Mr. Clark's care. While it is true that Ms. Saenz did not testify that Mr. Clark participated in or knew about her alleged methamphetamine use while pregnant with C.C., that lack of testimony does not, as Mr. Clark asserts, mean that there was no "direct" or "inferential evidence that Mr. Clark had anything to do with CC testing positive for methamphetamine at birth." It is the "jury's role to 'ascertain the facts, reconcile conflicts therein, and draw its own inferences if more than one inference was permissible.'" *Management Nominees, Inc. v. Skowronska*, 2019 WY 105, ¶ 27, 450 P.3d 672, 680 (Wyo. 2019) (alterations omitted) (quoting *Wyo. Med. Ctr., Inc. v. Murray*, 2001 WY 63, ¶ 8, 27 P.3d 266, 268 (Wyo. 2001)). On appeal, we disregard Mr. Clark's conflicting evidence, assume the evidence in favor of the Department was true, and afford the Department every favorable inference that may reasonably be drawn from it. *In re WDW*, 2010 WY 9, ¶ 17, 224 P.3d at 19. The evidence was sufficient to raise the inference that he either used methamphetamine with Ms. Saenz around G.C. and while she was pregnant with C.C., or at least was aware that she was using and did nothing to stop her.

[¶31] That said, we must note that the district court's instruction to the jury that Ms. Saenz's assertion of her Fifth Amendment right against self-incrimination permitted the jury to "draw an adverse inference from that assertion of the right" was erroneous. It is certainly true that, in a civil case, the factfinder may draw an adverse inference *against the party that invokes* the Fifth Amendment privilege. *Thornock v. Esterholdt*, 2016 WY 63, ¶ 29, 375 P.3d 750, 758 (Wyo. 2016). The district court's instruction did not make clear that the adverse inference arising from Ms. Saenz's invocation of the privilege could only be drawn against Ms. Saenz, and not Mr. Clark. However, in these circumstances the error was harmless because the evidence, discounting any adverse inference arising from assertion of the Fifth Amendment privilege, permitted the jury to infer that Mr. Clark participated in or knew about Ms. Saenz's drug use.

[¶32] The Department also introduced evidence that Mr. Clark failed to comply with his case plan, despite the Department's reasonable efforts to reunify him with C.C. and G.C. Throughout the period that C.C. and G.C. were in the Department's custody, the Department attempted to provide Mr. Clark with resources and support to assist him in becoming a fit parent. *See In re BAD*, 2019 WY 83, ¶ 29, 446 P.3d at 229 (Fox, J., specially concurring) ("The purpose of the 15-month delay in [Wyo. Stat. Ann. § 14-2-309](a)(v) is to allow the Department time to make reasonable efforts to aid the parent in becoming fit."). The Department arranged and paid for Mr. Clark's drug testing, arranged and transported the children to visitation, and made various referrals to counseling services. Its task became more difficult when Mr. Clark disappeared in November 2016, but the Department continued trying to contact Mr. Clark and ensured that services remained available to him. When Mr. Clark returned, it agreed "to help him find services and take documentation" of Mr. Clark's delayed attempts to comply with his case plan, despite the juvenile court relieving it from making further reasonable efforts. Mr. Clark, however, failed to complete almost every requirement of the case plan.

[¶33] In addition, he failed to take any steps "to assist with therapy and recovery of [C.C. and G.C.'s] significant mental health needs"; made no attempts to maintain a relationship with them when he left town in November 2016; and used methamphetamine as recently as two months before the trial in this matter began. There was sufficient evidence for the jury to find clear and convincing evidence that Mr. Clark was unfit at the time of the termination proceedings.

[¶34] We affirm.