KAUTZ, Justice.
[¶1] Appellant Cathy Ann Dunlap (Mother) challenges a district court decision terminating parental rights to three of her minor children pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v) (LexisNexis 2019). Her only claim is that the evidence was insufficient to support the termination. We affirm.
ISSUE
[¶2] Whether the district court correctly found clear and convincing evidence supported termination of Mother's parental rights.
*224 FACTS
[¶3] The following facts are based on the standard of review which requires us to examine the evidence in the light most favorable to the State, as the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by Mother. See SAS v. State of Wyo., Dep't of Family Servs. (In re AGS), 2014 WY 143, ¶ 19, 337 P.3d 470, 477 (Wyo. 2014).
[¶4] Mother has four children: BD, age 14 at the time of trial; CS, age 8 at the time of trial; AS, age 6 at the time of trial; and JE, age 3 at the time of trial. All four children were removed from Mother's home due to neglect - CS on April 21, 2015, and BD, AS and JE on July 22, 2015. JE was reunified with his father, who satisfactorily completed a case plan and, for a time, disassociated himself from Mother. The other children have been in foster care ever since.
[¶5] Mother originally lived in Florida, and BD was born there. Florida child protective services became involved with the family two or three times (Mother testified she was not sure if there were two or three interventions) beginning when BD was 2. Mother then moved to Minnesota for two months, and then to Illinois. In Illinois, Mother lived in a truck with BD and her ex-husband. Illinois child protective services became involved, and Mother placed BD, then age 5, in a crisis nursery to avoid having her placed in a foster home. From there, Mother returned to Florida for two weeks, but did not stay due to conflict with her siblings. Mother then moved to Tennessee with her ex-husband and BD. After a very short stay in Tennessee, Mother moved to Minnesota, and when "things [didn't] pan out in Minnesota" Mother, BD and the ex-husband moved to Arkansas. After staying in Arkansas for two months, Mother moved to California for a month, and then relocated to North Dakota in July 2009. Shortly thereafter, CS was born.
[¶6] In North Dakota, Mother and her children (BD and CS) first lived in a campground, then someone's basement, then a trailer, and then a camper. In December 2009, the State of North Dakota took custody of BD and CS due to inadequate living conditions. BD and CS remained in state custody until September 2012. Mother gave birth to AS in August 2011, who was also placed in foster care by North Dakota. While the children were in the custody of North Dakota child protective services, Mother had a case plan, but did not complete it. At that point, the children's maternal grandmother became their guardian and moved the children back to Florida with her. Mother moved to Florida about five months later.
[¶7] One year later, in February 2013, the children's maternal grandmother died, and "the children were just back" with Mother. Mother had encounters with police due to verbal altercations with her family, and with child protective services due to allegations of inadequate living conditions for the children. By the end of 2013, Mother moved to Converse County, Wyoming. Child protective services from Florida contacted the Department of Family Services (DFS) in Wyoming, which investigated the family and identified concerns for the children because CS was not potty trained and was not properly dressed.
[¶8] In September 2014, Wyoming DFS opened a case regarding the children based on school concerns that CS was dirty and suffered from social, academic and emotional issues. Mother refused services offered by DFS. School officials continued to report CS was excessively hungry, inadequately dressed for the weather, and reported her sister, BD, was responsible for feeding her and getting her ready for school. DFS visited Mother's home in January 2015 and found it very dirty. After that visit, DFS provided a counselor for BD, who diagnosed the 11-year-old as suffering from anxiety due to taking on the role of parenting her younger siblings and suffering from PTSD because she had frequently been removed from Mother's home.
[¶9] In February 2015, the State filed a juvenile case alleging Mother had neglected the children. Mother admitted the allegations. The children remained with Mother, who agreed to "get up in the morning and get her children ready for school and send them out in appropriate attire." Mother failed to do so, resulting in CS being placed *225 in foster care in April 2015. Next, Mother signed a case plan outlining what she should do to properly care for her children. She failed to comply with the basic portions of the plan, and the other children were placed in foster care in July 2015, based on the recommendations of a Multidisciplinary Team (MDT).
[¶10] Four months later, Mother moved to Casper (although the children remained in foster care in Douglas) and lived in a homeless shelter. She ultimately obtained an apartment in Casper, where she lived for the next year. DFS assisted her with visitation and provided counseling and parenting training. Mother mostly cooperated with DFS but was unable to sufficiently recall and apply parenting strategies to obtain custody of the children. Her counselor described the situation as one where Mother did not remember "what the kids needed every morning, to make sure the laundry was done, to make sure homework was done, backpacks were packed, to make sure that appropriate discipline was used."
[¶11] From May 8, 2015, to March 1, 2016, Mother agreed to three "Family Service Plans" with DFS, each of which was designed to accomplish "family preservation" (before the children were removed) and "family reunification" (after the children were placed in foster care). Each of those plans advised Mother there was a risk of termination if reunification was not timely accomplished. Each of those plans required Mother to cooperate with therapy for the children, participate in parenting instruction and counseling, put lessons learned into practice, fully cooperate and remain in contact with DFS, seek employment, visit with the children, maintain an appropriately clean and safe household, obtain appropriate housing for the children, obtain and comply with medical care for Mother's seizures, enroll in and successfully complete a parenting class, and obtain services from vocational rehabilitation leading to employment.
[¶12] In December 2016, Mother had not sufficiently completed the case plan to accomplish reunification with the children. She participated in counseling but was unable to put the things she learned into practice. She visited with the children but was often distracted and did not relate to the children. At times she engaged in inappropriate interactions with them. She qualified for vocational rehabilitation but resisted obtaining employment, fearing it would interfere with her disability income and would cause her "stress." She participated in counseling for the children but became irate and refused to cooperate with a plan for BD because she disagreed with it.
[¶13] That month, Mother moved to North Dakota to reunite with JE's father. She did not notify DFS before she moved, and after the move, she gave DFS a false address. In North Dakota, she did not participate in any counseling, did not take parenting classes, did not work with vocational rehabilitation, and did not maintain employment. She also did not obtain treatment for her seizures.
STANDARD OF REVIEW
[¶14] In a termination of parental rights case we use the following standard of review:
Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of a contention is highly probable. Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.
In re AGS, ¶ 19, 337 P.3d at 477.
DISCUSSION
[¶15] While the district court found clear and convincing evidence supported termination *226 of Mother's parental rights under both § 14-2-309(a)(iii) and (v), we need only determine whether clear and convincing evidence supports one of the bases for termination. DMM v. State of Wyo., Dep't of Family Servs. (In re ZMETS), 2012 WY 68, ¶ 18, 276 P.3d 392, 397 (Wyo. 2012). We will review the district court's finding of clear and convincing evidence to support termination under § 14-2-309(a)(v).
[¶16] To terminate the parent-child relationship under § 14-2-309(a)(v), the district court must find by clear and convincing evidence the child has been in foster care for fifteen of the most recent twenty-two months and the parent is unfit to have custody and control of the child. The statute does not define the term "unfit," but this Court has previously stated:
Fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child. Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child.
AJJ v. State of Wyo., Dep't of Family Servs. (In re KMJ) , 2010 WY 142, ¶ 15, 242 P.3d 968, 971 (Wyo. 2010) (quoting JLW v. CAB , 2010 WY 9, ¶ 17, 224 P.3d 14, 19 (Wyo. 2010) ). We have further explained a parent's unfitness is generally demonstrated by a variety of factors:
We have previously recognized that in the ordinary parental rights termination case consideration must be given to a combination of factors, incidents, and conditions that demonstrate the neglect required to justify termination of parental rights. Rarely do we find a single condition or incident that, standing alone, would justify termination. Rather, neglect is usually manifested by numerous incidents and conditions extending over a considerable length of time.
CL v. State of Wyo., Dep't of Family Servs. (In re AD) , 2007 WY 23, ¶ 26, 151 P.3d 1102, 1108 (Wyo. 2007) (quoting MN v. Dep't of Family Servs. (In re MN) , 2003 WY 135, ¶ 13, 78 P.3d 232, 236 (Wyo. 2003) (internal citations omitted)).
[¶17] The statute requires the district court make a finding of a parent's unfitness at the time of the termination proceedings; however, the court need not ignore evidence of the parent's previous unfitness. In re KMJ , ¶ 17, 242 P.3d at 971. "Evidence of a parent's past behavior is 'plainly relevant in determining current parental fitness.' " In re AGS , ¶ 24, 337 P.3d at 478 (quoting HJO v. State of Wyo., Dep't of Family Servs. (In re KMO) , 2012 WY 99, ¶ 19, 280 P.3d 1203, 1211 (Wyo. 2012) ). Therefore, " '[i]t is appropriate for a district court to consider a parent's history and pattern of behavior over time in determining whether rights should be terminated.' " In re KMJ, ¶ 17, 242 P.3d at 971 (quoting JLW , ¶ 24, 224 P.3d at 20 ).
[¶18] Mother conceded the children had been in foster care with DFS for more than fifteen of the last twenty-two months at the time of the termination petition. However, she asserts the evidence did not establish she was unfit to parent at the time of trial because she testified she had a clean home and took care of JE while living in North Dakota with JE's father. She claims she has made "long term changes" that improved her life. Of course, our standard of review requires us to discount Mother's evidence if it conflicts with evidence supporting the trial court's decision. That is the case here. Although Mother cooperated to some extent in counseling and visitation during the year before she moved to North Dakota, the evidence showed she did not demonstrate an ability to appropriately parent. The evidence showed Mother's relationship with, and ability to meet the needs of, the children did not change much during that time, and any changes were not necessarily positive. Similarly, although Mother claimed to have improved her living conditions in North Dakota, the evidence showed she gave DFS a false address and entirely disregarded many portions of her case plan which were designed to assure she could meet the children's basic needs.
[¶19] The trial judge made specific findings about Mother's fitness. The findings related to her history included: (1) "[an] extensive history of unstable and unsanitary living arrangements, *227 " (2) "constant relocations to at least eight different states in various environments such as campgrounds, campers, trucks, homeless shelters, storage units, basements, trailers and hotels," (3) "history of inability to properly parent her children," (4) failure to "seek appropriate assistance," (5) "constant failure to follow case plans," and (6) inability to provide "the basic necessities for her children even when she is afforded ample opportunities." The findings related to her current situation included: (7) "she is not employed ... (and) elects not to [seek employment] for fear of losing her disability checks," (8) she "has not sought an individual counselor or family counselor," and (9) she "has not sought a doctor for her seizures or treatment of her disability." The trial court discounted Mother's proclamations that she had changed in North Dakota, finding "no evidence her situation is any different than it has been in the past." The totality of these findings, both historical and current, led the trial court to conclude Mother is unfit to parent.
[¶20] After a careful review of the record, we find each of the district court's findings was supported by clear and convincing evidence. The district court heard testimony from various DFS case workers, counselors, and Mother herself. This testimony demonstrates a clear pattern of the inability to recognize and provide for the ongoing physical, mental and emotional needs of the children. When we review both the evidence of Mother's current situation and her history, the district court's decision finding Mother unfit is supported by clear and convincing evidence.
[¶21] Affirmed.
FOX, Justice, specially concurring, in which GRAY, Justice, joins.
[¶22] I concur with the majority's result. I write separately because I would hold that Wyo. Stat. Ann. § 14-2-309(a)(v) (LexisNexis 2019) requires the Department to prove by clear and convincing evidence that it made reasonable efforts to reunite parent and child before terminating parental rights.
I. The State should be required to demonstrate its reasonable efforts to reunify the family as part of its showing the parent is unfit
[¶23] Although consistent with our precedent, I believe the majority's interpretation of Wyo. Stat. Ann. § 14-2-309(a)(v) continues to unfairly stack the deck against parents in termination proceedings. Our interpretation of (a)(v) makes it too easy for the State to permanently sever parent relationships with their children and deprive parents of their fundamental rights. In many termination cases, the Department will bring multiple grounds that it believes justify termination. Subsection (a)(v) allows termination on clear and convincing evidence that: 1) "The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months," and 2) "a showing that the parent is unfit to have custody and control of the child." See, e.g. , In re AGS , 2014 WY 143, ¶ 18, 337 P.3d 470, 477 (Wyo. 2014) ; In re KAT , 2012 WY 150, ¶ 15, 288 P.3d 1217, 1221-22 (Wyo. 2012) ; Wyo. Stat. Ann. § 14-2-309(a)(v). Because (a)(v) is largely a simple "mathematical question," In re AGS , 2014 WY 143, ¶ 21, 337 P.3d at 477, we will often affirm a termination on that ground without considering any alternative ground. See, e.g. , Matter of KCS , 2019 WY 15, ¶ 11, 433 P.3d 892, 895 (Wyo. 2019) ; In re AGS , 2014 WY 143, ¶ 20, 337 P.3d at 477.
[¶24] Our precedent affirming on (a)(v) grounds has essentially read the fitness prong out of the equation, so that the basis for termination is the purely mathematical question of whether the child has been in foster care for 15 of the most recent 22 months. This is because virtually every parent involved in termination proceedings is likely "unfit" to begin with. But "the Department's very existence is premised on the assumption that it will deal with dysfunctional, disturbed and/or irresponsible parents." Jeanne M. Kaiser, Finding a Reasonable Way to Enforce the Reasonable Efforts Requirement in Child Protection Cases , 7 Rutgers J. L. & Pub. Pol'y 100, 118 (Fall 2009). Concerning fitness, we have said:
*228 "[F]itness includes the ability to meet the ongoing physical, mental, and emotional needs of the children." LeBlanc [v. State Dep't of Family Servs. , 2017 WY 107,] ¶ 22, 401 P.3d [932,] 936 [ (Wyo. 2017) ] (citations omitted). Fitness also "relates to a parent's ability to provide or maintain a 'positive, nurturing parent-child relationship.' " Id. (quoting Matter of GP , 679 P.2d 976, 1005 (Wyo. 1984) ).
Matter of KCS , 2019 WY 15, ¶ 13, 433 P.3d at 896. Factors we have considered when evaluating fitness include:
1) inability to assist with therapy and recovery of a child with significant mental health needs; 2) lack of contact with and expressed lack of desire to take custody of the child; 3) contribution to the child's mental health or behavioral problems; 4) unstable living situation relating to employment or maintenance of a suitable home; 5) criminal record, particularly one primarily related to drug use, or a pattern of ongoing drug use; 6) failure to take responsibility for past conduct; 7) lack of emotional bond with the child; 8) failure to develop child-rearing skills; 9) convictions for crimes involving a potential for harming the child; 10) inability to monitor or make healthy nutritional choices or to provide a safe environment; 11) a history of surrounding herself and the children with unsafe individuals; and 12) the child has become upset by or resistant to visitation with the parent.
LeBlanc v. State Dep't of Family Servs. , 2017 WY 107, ¶ 23, 401 P.3d 932, 936 (Wyo. 2017) (citations omitted). In my view, most of the fitness factors we consider are precisely the kinds of problems that lead the State to become involved with the child in the first instance. Thus, the fitness factor must require something more as the case moves toward termination.
[¶25] The purpose of the 15-month minimum is to allow the Department to attempt to rehabilitate the family and achieve reunification. The fitness prong under (a)(v) was meant to provide context for the 15-month "waiting period." We are to consider whether there has been some discernable change in the parent's situation during the intervening 15 months since the child was removed. See Catherine J. Ross, The Tyranny of Time: Vulnerable Children, "Bad" Mothers, and Statutory Deadlines in Parental Termination Proceedings , 11 Va. J. Soc. Pol'y & L. 176, 202 (Winter 2004). Otherwise, there would be no reason to wait the 15 months. See In re A.D. , 2007 WY 23, ¶ 32, 151 P.3d 1102, 1110 (Wyo. 2007) ("The Wyoming legislature followed the federal lead and adopted statutes which require the parent to rehabilitate, with the aid of state services , within a reasonable amount of time.") (emphasis added). During that 15-month period, the State is obligated to continue to make reasonable efforts to reunify the family to ensure possible achievement of fitness.
[¶26] The legislature has identified certain situations in which no delay is required because efforts at reunification would be futile and unsafe for the child, which further supports the conclusion that the Department's reasonable efforts to reunify should continue through the 15-month period. Section 14-2-309(a)(ix)(B) expressly excludes the reasonable efforts requirement when termination proceedings are brought on the ground that the "parent committed sexual assault and the child was conceived as a result of the sexual assault." Wyo. Stat. Ann. § 14-2-309(a)(ix)(B). Likewise, Wyo. Stat. Ann. § 14-2-309(b) states that parental rights may be terminated upon evidence that the parent has committed certain crimes "with no requirement that reasonable efforts be made to reunify the family." Subsection 14-2-309(c) also expressly dispenses with the reasonable efforts requirement when clear and convincing evidence establishes certain specified circumstances, such as chronic abuse or torture. This exclusionary language indicates that reasonable efforts is an implicit requirement in termination of parental rights proceedings and that the State is only relieved of that obligation when the legislature expressly says so.
[¶27] If the legislature had intended to exclude the reasonable efforts requirement from section (a)(v) it would have done so expressly, as it did in sections 14-2-309(a)(ix)(B), 309(b), and (c), and 14-3-431(e). Section 14-3-440, the statute which requires *229 reasonable efforts to reunify in neglect and abuse cases, also specifically provides that such efforts are not required in termination proceedings brought under circumstances defined in Wyo. Stat. Ann. § 14-2-309(a)(vi), (b) or (c), again suggesting that section 14-3-440's reasonable efforts requirement is applicable when termination is sought on other grounds. See Wyo. Stat. Ann. § 14-3-440(g), referencing Wyo. Stat. Ann. § 14-2-309(a)(vi), (b) or (c).
[¶28] In addition, when the Wyoming legislature adopted the 15/22 subsection, it included three exceptions to the requirement that the State file a petition to terminate once the child has reached the 15/22 threshold:
(m) When a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months the state shall file a petition to terminate parental rights or seek to be joined as a party to the petition if a petition has been filed by another party, unless :
(i) The child is in the care of a relative;
(ii) The state agency has documented in the case plan a compelling reason for determining that filing the petition is not in the best interest of the child; or
(iii) The state agency has not provided services to the child's family deemed to be necessary for the safe return of the child to the home, if reasonable efforts described in W.S. 14-3-440 are required to be made.
Wyo. Stat. Ann. § 14-3-431 (emphasis added). The inclusion of subsection (m)(iii) is further support that proof of "reasonable efforts" must play a role in the termination action under (a)(v).[1]
[¶29] Because "[t]ermination of parental rights is the family law equivalent of the death penalty in a criminal case," we have recognized that "parents facing the termination of their parental rights-fundamental constitutional rights-must be afforded every procedural and substantive protection the law allows." In re FM , 2007 WY 128, ¶ 28, 163 P.3d 844, 851 (Wyo. 2007). We strictly construe the "applicable statutes against those seeking termination and in favor of the non-consenting parent." In re AE , 2009 WY 78, ¶ 11, 208 P.3d 1323, 1326 (Wyo. 2009) (citations omitted). The purpose of the 15-month delay in (a)(v) is to allow the Department time to make reasonable efforts to aid the parent in becoming fit. Thus, I would interpret the fitness prong to incorporate the requirement that the Department show by clear and convincing evidence its reasonable efforts to reunite parent and child.
[¶30] Legislative history further supports this interpretation. In 1980, Congress enacted the Adoption Assistance and Child Welfare Act (AACWA) that established a reimbursement program for states that made "reasonable efforts" to reunify children in foster care with their parents. See Suter v. Artist M. , 503 U.S. 347, 350-51, 112 S.Ct. 1360, 1363-64, 118 L.Ed.2d 1 (1992) ; Martin Guggenheim & Vivek S. Sankaran, Representing Parents in Child Welfare Cases § 1.03, at 4 (Amer. Bar Ass'n 2015) (stating that the AACWA was meant to ensure, among other things, that "reunification services are made available to the child and his or her parents after removal from the home") (citing H.R. Rep. No. 96-136, at 6 (1979)). Despite the laudable goal of requiring "reasonable efforts" at reunification, however, it soon became apparent that this goal of reunification resulted in children "languishing in foster care." See In re H.G. , 197 Ill.2d 317, 259 Ill.Dec. 1, 757 N.E.2d 864, 866 (2001). So, in 1997, Congress passed the *230 Adoption and Safe Families Act (ASFA). Pub. L. No. 105-89, 111 Stat. 2115 (1997). Part of the Act created the 15/22 ground for termination and tied federal funding to a state's adoption of it. In re H.G. , 259 Ill.Dec. 1, 757 N.E.2d at 866. In 1998, the Wyoming legislature added the 15/22 subsection to our termination statutes, including the "fitness" prong. Wyo. Stat. Ann. § 14-2-309(a)(v) (LexisNexis 1998 Supp.). Section (a)(v) is an attempt to balance the sometimes conflicting goals of reunification of the family and permanency for the child; it is not intended to sacrifice the goal of reunification to the goal of permanency.
II. Reasonable efforts to reunify do not cease with the end of the juvenile case
[¶31] Some of the challenge for the district courts in termination cases lies in our statutory structure, which relegates certain proceedings to juvenile court, and others to district court, and makes an arbitrary distinction between the two. The Child Protection Act, Wyo. Stat. Ann. §§ 14-3-401 through 14-3-440, vests the juvenile court with jurisdiction over "proceedings concerning a minor alleged to be neglected." Wyo. Stat. Ann. § 14-3-403(a). It contains procedures that "must be followed upon an allegation that a person has neglected a child in his custody." In re SJJ , 2005 WY 3, ¶ 34, 104 P.3d 74, 83-84 (Wyo. 2005). Among those procedures is the express requirement that the Department make reasonable efforts to preserve and reunify a family before removing a child from the home. Wyo. Stat. Ann. § 14-3-440. However, we have repeatedly held that the Act only applies to neglect and abuse proceedings in juvenile court. In re AM-LR , 2018 WY 76, ¶¶ 8-10, 421 P.3d 551, 554 (Wyo. 2018) ; In re SJJ , 2005 WY 3, ¶ 34, 104 P.3d at 83 ; In re MN , 2003 WY 135, ¶ 37, 78 P.3d 232, 240 (Wyo. 2003). We treat termination of parental rights proceedings in district court as "entirely separate and distinct from neglect proceedings." In re AM-LR , 2018 WY 76, ¶ 9, 421 P.3d at 554 (quoting In re MN , 2003 WY 135, ¶ 37, 78 P.3d at 240 ). Yet, despite our insistence that termination and neglect proceedings "are entirely separate," we have acknowledged that "the two enactments are in some cases closely intertwined," In re SJJ , 2005 WY 3, ¶ 34, 104 P.3d at 83, and that the distinction between them is "technical" because "district judges also sit as juvenile court judges." KC v. State , 2015 WY 73, ¶ 26 n.3, 351 P.3d 236, 244 n.3 (Wyo. 2015).
[¶32] This technicality has profound consequences for parents navigating the procedural nuances between the two proceedings. Here, for example, Ms. Dunlap admitted to allegations in the juvenile court neglect petition without appointed counsel. That admission adversely affected her in the later termination proceeding, where the district court twice cited it in its decision terminating her parental rights. District court reliance on juvenile neglect proceedings is not uncommon in termination proceedings. E.g. , In re AM-LR , 2018 WY 76, ¶ 10, 421 P.3d at 554 ("Mother does not challenge the juvenile court's jurisdiction in the neglect proceedings in which she admitted the allegations brought against her."); In re SJJ , 2005 WY 3, ¶ 38, 104 P.3d at 84 ("We hold that use of the juvenile court records in the termination proceedings was entirely appropriate.... The juvenile court records concerning the children in this case were directly related to the termination of parental rights proceeding and were necessary for determining the issue of whether parental rights should be terminated. The two proceedings were closely entwined."). Indeed, the majority opinion relies significantly on Mother's "previous unfitness," and expressly states that "[i]t is appropriate for a district court to consider a parent's history and pattern of behavior over time in determining whether rights should be terminated." In re KMJ , 2010 WY 142, ¶ 17, 242 P.3d 968, 971 (Wyo. 2010) (quoting JLW v. CAB (In re WDW) , 2010 WY 9, ¶ 24, 224 P.3d 14, 20 (Wyo. 2010) ).
[¶33] If the courts may consider the parent's history (which necessarily includes the reasonable efforts in the preceding neglect case) in termination proceedings, as the district court and the majority did here, then we should give up the fiction that the termination case is entirely separate and distinct from the neglect proceedings. And, we should take into account the important fact that a neglect proceeding in juvenile court entails a *231 less demanding standard of proof than a district court termination. KC , 2015 WY 73, ¶¶ 20, 37, 351 P.3d at 242, 246 (explaining that the State's burden of proof in a juvenile neglect proceeding is a preponderance of the evidence, while termination of parental rights requires clear and convincing evidence of grounds for termination).
[¶34] Compounding the problem is that parents have limited recourse from this Court on appeal. For one, we review a juvenile court's neglect decision for an abuse of discretion, meaning that parents will have a difficult time persuading us to reverse a decision that very well may be used against them in a subsequent termination proceeding. See KC , 2015 WY 73, ¶¶ 18, 51, 351 P.3d at 242, 248-49 ("We give considerable deference to the trial court's determination") (alterations omitted). We also decline to address issues arising from neglect proceedings when a parent appeals the result of a termination. E.g. , In re AM-LR , 2018 WY 76, ¶ 10, 421 P.3d at 554 ("Mother's remedy, if she had one, was in juvenile court. Mother failed to appeal the Order Upon Permanency Hearing and cannot collaterally attack that order here under the guise of appealing the district court's order terminating Mother's parental rights."); In re KGS , 2017 WY 2, ¶ 23, 386 P.3d 1144, 1148 (Wyo. 2017) ("Any issues that Appellant had with improper notice [in the juvenile proceeding] should have been raised in those proceedings."); In re SJJ , 2005 WY 3, ¶ 35, 104 P.3d at 84 ("In the neglect proceeding ... DFS was required to make reasonable efforts to reunify the family prior to placing the children outside the home. The neglect proceeding, however, is not before us-paternal grandmother did not appeal from the juvenile court neglect determination claiming that DFS failed to make reasonable efforts to reunify the family."). Thus, a parent's failure to appreciate the distinction between two proceedings concerning the same children and presided over by the same judge may result in the unwitting sacrifice of important rights.
III. Clear and convincing evidence of reasonable efforts in this case?
[¶35] Turning to whether the Department made adequate efforts to reunite Ms. Dunlap with her children, I am skeptical of the district court's conclusion. In considering termination under section 14-2-309(a)(iii), the district court found:
The Department also showed by clear and convincing evidence that it made reasonable reunification efforts and that those efforts were unsuccessful. Starting in the Fall of 2014, the Department attempted to help Dunlap with her parenting until at least December of 2016. It was in December of 2016 that the permanency goal changed from reunification to termination and adoption. During this two and half year period, the Department provided numerous services for Dunlap including wrap-around services, counseling for Dunlap and the children, arranged various types of visitation with Dunlap and the children (both in person and by telephone), arranged parenting classes, provided applications for services for the children for counseling and tutoring, arranged for public health nurse meetings, implemented the early head-start program, provided "successful families" services, and continued to offer services throughout the time the Department was involved.
[¶36] Perhaps because we often affirm termination of parental rights on grounds we have concluded do not require reasonable efforts, the reasonable efforts requirement is not well defined. See In re L.A. , 2009 WY 109, ¶ 24, 215 P.3d 266, 271 (Wyo. 2009) (declining to consider reasonable efforts because termination action was not brought on section 14-2-309(a)(iii) grounds, the only ground requiring the Department to prove reasonable efforts by clear and convincing evidence) (citing In re SJJ , 2005 WY 3, ¶¶ 30-32, 104 P.3d at 82-83 (same)); In re AE , 2009 WY 78, ¶¶ 14-16, 208 P.3d at 1327 (same); In re KMJ , 2010 WY 142, ¶¶ 21-22, 242 P.3d at 972-73 (same); Matter of KCS , 2019 WY 15, ¶ 12, 433 P.3d at 896 (same). Some guidance is found at Wyo. Stat. Ann. § 14-3-440(e), which states: "Reasonable efforts determinations shall include whether or not services to the family have been accessible, available and appropriate." We discussed what reasonable efforts might include in In re FM , 2007 WY 128, ¶ 14, 163 P.3d at 848.
*232 There, we held that the Department had not shown by clear and convincing evidence that it made reasonable efforts under Wyo. Stat. Ann. § 14-2-309(a)(iii) because it had done nothing to facilitate communication between the child and his mother, who was incarcerated. Id. We compared the Department's lack of efforts to efforts made in In re HP , 2004 WY 82, ¶ 26, 93 P.3d 982, 990 (Wyo. 2004). Id. at ¶ 14 n.3, 163 P.3d at 848 n.3. There, Mother was also incarcerated, and the Department had "tailored case plans to her situation" by "arrang[ing] overnight-unsupervised visits between the children's maternal grandmother and the children," which "allowed Mother visitation with her children because [the grandmother] took the children to the Women's Center twice a month." Id. The Department also "requested and the court appointed a CASA worker to facilitate providing services to Mother and the children." Id. When Mother was released from the Women's Center, the Department allowed visitation with the children, "offered Mother transportation to visitation, recommended Mother for counseling services, and assisted Mother in procuring suitable housing." Id.
[¶37] I believe Wyo. Stat. Ann. § 14-3-440(e) 's "accessible, available and appropriate" language and In re HP 's discussion of "tailored" case plans suggest that the Department is obligated to make reasonable efforts suitable to the unique situation of the family involved. While the Department is only required to make "reasonable efforts," those efforts must "go beyond mere matters of form, such as the scheduling of appointments, so as to include real, genuine help to see that all things are done that might conceivably improve the circumstances of the parent and the relationship of the parent with the child." Matter of Welfare of J.A. , 377 N.W.2d 69, 73 (Minn. Ct. App. 1985). As noted, most parents who come into contact with the Department are likely to have significant, unique challenges that make parenting difficult. "Thus, it seems only fair that the reasonable efforts requirement be tailored to meet the propensities of those parents, and not those of the average, responsible parent who might be expected to eagerly accept available services." Kaiser, supra at 118.[2]
[¶38] Here, evidence concerning how or if the Department sought to tailor its rehabilitative efforts to Ms. Dunlap's unique challenges is thin. Although the Department made referrals and arranged services, such as parenting classes, the record is sparse as *233 to the Department's efforts beyond referrals. Rather, the record suggests the Department left the case in Ms. Dunlap's hands with little follow up. It is unclear what the classes consisted of or how the Department assisted Ms. Dunlap with implementing what she learned. As to Ms. Dunlap's ability to find a job, other than the referral to vocational rehabilitation, the record does not provide how the Department ensured that Ms. Dunlap was pursuing employment that would meet her and her children's needs. What we do know is that Ms. Dunlap was disabled and had a high school education. She received social security disability because she suffered from seizures and the reason she qualified for that assistance was because of her inability to work. The record is vague as to how the Department took this into consideration. The record does not reveal how or if the Department assisted Ms. Dunlap in securing government or private assistance to meet her financial needs to better provide appropriate clothing for her children-one of the initial reasons they were taken into DFS custody. Compare SD v. Carbon Cty. Dep't of Family Servs. , 2002 WY 168, ¶ 16, 57 P.3d 1235, 1239-40 (Wyo. 2002) ("The record is filled with instances of DFS meeting this responsibility. A summary indicates a community-wide response by nearly every available resource made up of individuals committed to family reunification.... The organizations providing services to this family include soup kitchen, faith-based services, DFS, Public Health, Carbon County Extension Office, Project Reach, Carbon County Counseling, Southeast Mental Health, Needs, Inc., and the Department of Vocational Rehabilitation.").
[¶39] That said, under our standard of review, I cannot say the district court committed reversible error. Examining the evidence in the light most favorable to the Department and discounting any conflicting evidence,[3] the evidence was sufficient to support a finding of adequate reasonable efforts. Thus, I concur in the result of the majority opinion.

I recognize that we have appeared to interpret these "exceptions," not as precluding the filing of a petition, but rather as circumstances where the Department's decision to file the petition to terminate is "optional." See In re KMO , 2012 WY 99, ¶ 16, 280 P.3d 1203, 1210-11 (Wyo. 2012). But that interpretation in KMO conflicts with the language in Wyo. Stat. Ann. § 14-3-409(b) that requires the court to inform a parent at a shelter care hearing that the State must file a petition to terminate if the child reaches the 15/22 threshold "unless the court finds that one (1) of the exceptions listed in W.S. 14-3-431(m) applies." In re DRT , 2010 WY 137, ¶ 9, 241 P.3d 489, 494 (Wyo. 2010) (quoting Wyo. Stat. Ann. § 14-3-409(b) ). This suggests that a court must first determine whether reasonable efforts were made before it can terminate the parent's rights under (a)(v). This determination must happen within the termination action and the Department must carry the burden that it did in fact provide reasonable efforts.

Other jurisdictions incorporate more precise definitions of "reasonable efforts" in their statutes, which make clear that meaningful, rather than perfunctory, efforts are required. See, e.g. , M.S.A. § 260.012 (defining reasonable efforts to require "the exercise of due diligence by the responsible social services agency to use culturally appropriate and available services," including consideration of whether services were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances."); C.R.S.A. § 19-3-208 (enumerating services the Department should provide "as determined necessary and appropriate by individual case plans," including child care, transportation, in-home supportive homemaker services, mental health and health care services, after care services to prevent a return to out-of-home placement, and financial services). Some cases from these jurisdictions "suggest that simply providing a more comprehensive definition of reasonable efforts in the state statute serves to motivate the state to take the requirement more seriously." Kaiser, supra at 131-32. For example, in People ex rel. J.M. , 74 P.3d 475, 477 (Colo. App. 2003) :
a developmentally disabled mother challenged the state's efforts because the state did not assure that she received services from a specific agency specializing in serving individuals with developmental disabilities. The Colorado Court of Appeals found that the reasonable efforts requirement was nonetheless satisfied because for eleven months the mother received forty-four hours of weekly in-home family preservations services. These services included hands-on repetitive instruction about parenting skills, nutrition, budgeting, and basic life skills. The family preservation worker and the mother's case worker were aware of her developmental disabilities and adjusted their services to accommodate issues associated with her problems. Moreover, the mother ultimately received services from the agency specializing in developmental disabilities, including being placed with a host family. Thus, although the mother may have been disappointed with the outcome, the court's determination that the mother had received sufficient help from the state seems completely reasonable.
Kaiser, supra at 132.

In any event, there is not much conflicting evidence to consider. Ms. Dunlap's counsel does not appear to have made any great effort to contest the State's reasonable efforts in the lower court. This is understandable given that the Department sought termination under Wyo. Stat. Ann. § 14-2-309(a)(v), which, I believe mistakenly, does not require reasonable efforts under our precedent and the majority opinion.