# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 13

### OCTOBER TERM, A.D. 2025

### January 23, 2026

IN THE MATTER OF THE
TERMINATION OF PARENTAL
RIGHTS TO: BAR, minor child,

HEATHER DAWN RITCHIE,

Appellant
(Respondent),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF FAMILY
SERVICES,

Appellee
(Petitioner).

S-25-0127

*Appeal from the District Court of Natrona County*
The Honorable Thomas T.C. Campbell, Judge

*Representing Appellant:*
Geneva Englehart, Englehart Law LLC, Casper, Wyoming.

*Representing Appellee:*
Keith Kautz, Wyoming Attorney General; Christina McCabe, Deputy Attorney General; Wendy Ross, Senior Assistant Attorney General; Shawnna Lamb, Wyoming Attorney General's Office, Cheyenne, Wyoming.

*Guardian Ad. Litem:*
Joseph R. Belcher, Director; Kim A. Skoutary Johnson, Wyoming Office of Guardian ad Litem, Cheyenne, Wyoming.



*Before BOOMGAARDEN, GRAY, FENN, JAROSH, JJ., and HEALY, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]    After a five-day bench trial, the district court granted the Wyoming Department of Family Services' (the Department) petition to terminate Heather Dawn Ritchie's (Mother) parental rights to her child, BAR, pursuant to Wyo. Stat. Ann. §§14-2-309(a)(iii) and (v) (2023). Mother appeals, arguing the district court had insufficient evidence to terminate her parental rights. We affirm the district court's termination under §14-2-309(a)(v).

## ISSUE

[¶2]    We state the dispositive issue as:

Whether the record contains sufficient evidence to support the district court's termination of Mother's parental rights pursuant to Wyo. Stat. Ann. § 14-2-309(a)(v).

## FACTS

### General Background

[¶3]    Mother has five children — JR, CJ, KR, AR, and BAR. She has an extensive history with the Department and has had multiple juvenile cases. The first juvenile case opened in 2014 involving JR.

[¶4]    A second juvenile case opened in 2017 after police arrested Mother on an outstanding warrant. As a result of that case, JR and KR were removed from Mother's home. Mother has not had legal custody of either child since that time. Although Mother agreed to give JR up for adoption, at the time of trial, JR was in the legal custody of the State of Alabama and lived at a treatment facility there. DFS placed KR with his father, who has had legal custody of him since.

[¶5]    The third juvenile case began in 2018 after Mother left AR unattended in a hot vehicle, resulting in a misdemeanor child-endangerment conviction. Later in 2018, Mother was convicted of domestic battery for kicking, punching, and biting AR's father. AR has not returned to Mother's care since her removal in 2018. As for CJ, mother relinquished her parental rights to him in approximately 2021. He currently lives with his biological father in Colorado. As a result of these events, Mother had custody of only BAR as of September 2022.

### Current Case

[¶6]    On September 7, 2022, Casper Police Officer Matthew Lougee responded to a call for a welfare check after a neighbor reported Mother's vehicle had been parked and running

1

in an alley for approximately ninety minutes with an unattended child inside. The neighbor also reported Mother appeared to be intoxicated on drugs. When he arrived, Officer Lougee found Mother in the driver's seat and five children in the vehicle, only two of whom were hers, sixteen-month-old BAR and five-year-old KR.[1] Mother admitted there was a firearm in the vehicle and stated she was not allowed to possess firearms due to a "domestic charge." Officer Lougee asked Mother to step out of the vehicle and asked for permission to search the vehicle, which she granted.

[¶7] As Officer Lougee prepared to conduct his search, Mother asked if she could get Chapstick out of her purse, which was sitting on the passenger's seat. When Officer Lougee retrieved and opened the purse, he discovered two methamphetamine pipes wrapped in a bandana. Officer Lougee arrested Mother, and she admitted to using methamphetamine that morning while BAR and KR were in her custody. Shortly thereafter, the Department took BAR and KR into protective custody and returned the other three children to their parents. The State charged Mother with five counts of child endangerment under Wyo. Stat. Ann. § 6-4-405(b) and one count of possession of a controlled substance under Wyo. Stat. Ann. § 35-7-1031.

[¶8] Two days after Mother's arrest, on September 9, 2022, the district attorney filed an abuse and neglect petition alleging Mother neglected BAR and KR. At the shelter care hearing that same day, BAR was placed in the legal and physical custody of the Department and KR was placed in the legal and physical custody of his father, under the Division's supervision.[2] The juvenile court also ordered the appointment of a multi-disciplinary team (MDT).

[¶9] At the initial hearing a few weeks later, and while she remained incarcerated after her September 7 arrest, Mother admitted the neglect allegations, and the juvenile court adjudicated BAR as a neglected child.

[¶10] Following Mother's neglect adjudication, the Department created a Predisposition Report that included a permanency plan of reunification with Mother upon her successful completion of a case plan. There was no concurrent plan at the time of the original Predisposition Report. At the subsequent dispositional hearing on October 27, 2022, the juvenile court adopted the MDT's recommendation for a permanency plan of reunification. Meanwhile, Mother remained incarcerated on the related criminal charges until January 2023.[3]

---

[1] The record does not state why KR was with Mother at the time.
[2] The juvenile court subsequently dismissed KR from the case. As a result, Mother's parental rights related to him are not at issue in this appeal.
[3] In her related criminal case, Mother pleaded guilty to one count of child endangerment and received a sentence of three to five years in prison, suspended in favor of three years of supervised probation. Mother's judgment and sentence also required her to apply for and, if accepted, complete the Natrona County Adult Drug Court Program (Drug Court Program). Mother participated in the Drug Court Program

### *Case Plan and Department Services*

[¶11]  Mother's case plan with DFS emphasized sobriety, mental health, stability, and communication.  The plan required her to: complete an Addiction Severity Index (ASI) and follow its recommendations; submit two random urinalysis (UA) tests per week; attend weekly counseling; attend medication appointments and take medication as prescribed; obtain stable housing; complete parenting classes; and attend all case management meetings.[4]  Although Mother participated in developing the case plan, she never signed it.

[¶12]  Over time, the Department provided numerous forms of support to Mother to assist her in accomplishing the components of her case plan.  For example, the Department funded and arranged the ASI, set up visitation, paid for relapse prevention services, made counseling referrals, paid for UA testing, paid for transportation for BAR's visits, provided a bus pass, facilitated family case planning meetings and multi-disciplinary team meetings, and referred Mother to transitional housing programs.

### *Mother's Progress and Noncompliance*

[¶13]  Mother did not comply with most components of her case plan.  In terms of her sobriety, although she completed an ASI, she did not complete the recommended relapse prevention program.  She failed to appear for roughly twenty percent of the Department's required UAs and tested positive for THC approximately twenty-five times.  Mother's counselor and social worker also expressed concerns that Mother had stopped her medications and instead used delta-8.

[¶14]  Mother also did not sufficiently comply with the mental health portion of her case plan with the Department.  Mother switched between multiple counselors and did not consistently attend sessions.  Despite four months of sessions with one counselor, the counselor testified Mother made no progress, making her unable to comply with the case plan.

[¶15]  In addition, and after her release from jail, Mother did not obtain stable housing and frequently moved.  From the beginning of the case, Mother had nine different addresses, not including jail.  Mother often moved in with new romantic partners, and domestic violence and drug use were recurring issues in these relationships.  In 2023, Mother was convicted of domestic violence against a partner and served fourteen days in jail.

---

beginning in July 2023, but she was terminated in October 2023 for noncompliance after testing positive for THC.

[4] Because Mother was incarcerated at the time her case plan was developed, certain components could not be accomplished until she was released including, for example, the requirement that she obtain stable housing.

Employment was likewise inconsistent; she only obtained employment when required to do so through the Drug Court Program, more than a year into the neglect case.

[¶16] Mother also consistently struggled with visitation with BAR. Mother declined video visits with BAR while in jail from September 2022 to January 2023, and as a result, she went five months without contact with BAR. After her release from jail in January 2023, she could not begin in-home visits or unsupervised visits due to unstable housing, but she did begin supervised visits with BAR three times a week. Her attendance was inconsistent and often affected by her romantic relationship status — she attended visits if her romantic relationship was good but missed visits when a relationship was not going well.

[¶17] By July 2023, approximately ten months into the case, sixty-five visits with BAR had been scheduled. However, twenty-five were cancelled, including twelve by Mother. Mother also failed to show up to two other visits without calling to cancel. The facility coordinating visitation put Mother on a "time contract" that required her to arrive twenty minutes prior to a visit, or the visit would be cancelled.

### *Change of Permanency Plan*

[¶18] At a permanency hearing on August 31, 2023, the parties discussed Mother's recent domestic violence arrest and jailing, her numerous positive UAs, her failure to consistently attend counseling or take her medications, her unstable housing situation, and her sporadic visits with BAR. As a result of the lack of progress on her case plan, the MDT recommended the permanency plan be changed from reunification to adoption. However, the juvenile court continued the permanency plan of reunification and adopted a concurrent plan of adoption.

[¶19] When the MDT again recommended the plan be changed to adoption in October 2023, Mother requested an evidentiary hearing. After the January 18, 2024, evidentiary permanency hearing that followed, the juvenile court changed the permanency plan to adoption. That same month, the district court revoked Mother's probation in the related criminal case against her based upon her termination from the Drug Court Program due to positive UAs, missing a home visit, and failing to secure stable housing. The district court reinstated probation so Mother could complete a community corrections program at the Casper Reentry Center (CRC).

*Termination Proceedings*

[¶20]  On March 22, 2024, the Department petitioned the district court to terminate Mother's parental rights to BAR[5] under Wyo. Stat. Ann. §§ 14-2-309(a)(iii), (iv)[6], and (v). Under § 14-2-309(a)(iii), the Department alleged Mother neglected BAR; the Department made reasonable, though unsuccessful, efforts to rehabilitate the family; and BAR's health and safety would be seriously jeopardized by returning to Mother's care.  Under § 14-2-309(a)(v), the Department alleged BAR had been in foster case under the responsibility of the State of Wyoming for at least fifteen of the most recent twenty-two months, and Mother was unfit to have custody and control of BAR.

[¶21]  The district court appointed a guardian ad litem to represent BAR, and Mother filed a timely objection to the termination petition.  A five-day bench trial began on March 17, 2025.  The Department called ten witnesses, including Mother, and offered forty-two exhibits into evidence.  In addition to testifying on her own behalf, Mother called three witnesses and offered four exhibits.

[¶22]  On March 31, 2025, the district court announced its oral ruling, including numerous findings related to Mother's unfitness under § 14-2-309(a)(v).  On April 3, 2025, the district court entered its Order Terminating Parental Rights of Heather Dawn Ritchie.  The district court incorporated its prior oral findings and concluded that there was clear and convincing evidence to terminate Mother's parental rights under both Wyo. Stat. Ann. §§ 14-2-309(a)(iii) and (v).  This appeal followed.

## STANDARD OF REVIEW

[¶23]  In a termination of parental rights case, the following standard of review applies:

> Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny.  As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence.  Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of a contention is highly probable.  Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting

---

[5] The Department also included Father in its petition, but Father relinquished his parental rights and the Department dismissed the case against him.  His rights are not at issue in this appeal.

[6] The Department subsequently dismissed the request under this section.

5

termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

*Matter of PML,* 2024 WY 37, ¶ 19, 545 P.3d 856, 860 (Wyo. 2024) (citation modified).

## DISCUSSION

[¶24] Mother appeals the district court's findings that clear and convincing evidence supported termination of her parental rights under both Wyo. Stat. Ann. §§14-2-309(a)(iii) and (v). Because we may affirm if the evidence sufficiently supports termination under either statutory ground, we find that analyzing this case pursuant to § 14-2-309(a)(v) is dispositive. *Matter of JPL,* ¶ 21, 493 P.3d at 180 (citing *In re BAD,* 2019 WY 83, ¶ 15, 446 P.3d 222, 225-26 (Wyo. 2019)).

[¶25] For a court to terminate parental rights under § 14-2-309(a)(v), the Department must prove two elements by clear and convincing evidence: (1) the child has been in foster care under the responsibility of the State of Wyoming for fifteen of the most recent twenty-two months, and (2) the parent is unfit to have custody and control of the child. *See* Wyo. Stat. Ann. § 14-2-309(a)(v) (2023). The first element is a "mathematical question," which Mother does not dispute, and which the record confirms. *Matter of LCH,* 2019 WY 13, ¶ 10, 434 P.3d 100, 102 (Wyo. 2019). We therefore turn our focus to Mother's fitness.

[¶26] Section 14-2-309 does not define "unfit," but we have explained that fitness "includes the ability to meet the ongoing physical, mental and emotional needs of the child." *In re BAD,* ¶ 16, 446 P.3d at 226 (citation modified). Whether a parent is fit to have custody and control of a child must be determined in the context of each case and depends on the situation and attributes of the specific parent and child. *Matter of JPL,* ¶ 23, 493 P.3d at 180 (quoting *In re BAD,* ¶ 16, 446 P.3d at 226). "Rarely do we find a single condition or incident that, standing alone, would justify termination." *Id.*, ¶ 24, 493 P.3d at 180 (quoting *In re BAD,* ¶ 16, 446 P.3d at 226). Consideration must be given to the combination of factors, incidents, and conditions that demonstrate fitness over time. *Id.* Relevant factors could include:

> 1) inability to assist with therapy and recovery of a child with significant mental health needs; 2) lack of contact with and expressed lack of desire to take custody of the child; 3) contribution to the child's mental health or behavioral problems; 4) unstable living situation relating to employment or maintenance of a suitable home; 5) criminal record, particularly one primarily related to drug use, or a pattern of ongoing drug use; 6) failure to take responsibility for past

conduct; 7) lack of emotional bond with the child; 8) failure to develop child-rearing skills; 9) convictions for crimes involving a potential for harming the child; 10) inability to monitor or make healthy nutritional choices or to provide a safe environment; 11) a history of surrounding [oneself] and the children with unsafe individuals; and 12) the child has become upset by or resistant to visitation with the parent.

*LeBlanc v. State Dep't of Family Servs.,* 2017 WY 107, ¶ 23, 401 P.3d 932, 936 (Wyo. 2017) (citations omitted).

[¶27]   A parent's fitness is determined at the time of trial, but that does not mean the district court must ignore evidence of a parent's previous conduct and behavior in determining current parental fitness. *Matter of KGS,* 2017 WY 2, ¶ 16, 386 P.3d 1144, 1147 (Wyo. 2017) (quoting *PRG v. State, Dep't of Family Servs. (In re KMO)*, 2012 WY 100, ¶ 20, 280 P.3d 1216, [1223] (Wyo. 2012) (other citations omitted)).   Rather, evidence of past behavior is "plainly relevant" in determining fitness. *Matter of GGMC,* 2020 WY 50, ¶ 25, 460 P.3d 1138, 1146 (Wyo. 2020).

[¶28]   The Department's petition for termination alleged Mother made minimal progress on her case plan by failing to adequately address her mental health concerns, delaying treatment for substance abuse while continuing to use controlled substances, not maintaining a safe and stable home, and inconsistency with visitation and communication. In its oral ruling after trial, the district court found Mother unfit to have custody and control of BAR for the following reasons:  a) failure to sufficiently address mental health issues; b) failure to maintain a safe and stable home; c) failure to consistently participate in visitation, including declining all visitation for the first five months after BAR was placed in the Department's custody; and d) failure to adequately address substance abuse issues. Our review therefore focuses on whether, construing the evidence in the light most favorable to the Department and discounting conflicting evidence of the Mother, the Department presented sufficient evidence to support those findings.

[¶29]   Trial testimony established Mother did not consistently treat her significant mental health issues, which existed for years. According to one of her counselors, Coleen Meade, Mother's mental health diagnoses include bipolar disorder, anxiety disorder, histrionic personality disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. However, Mother struggled with attending counseling consistently. She had difficulty staying with one provider. She could not see one counselor because she owed money for missing an appointment. Ms. Meade stopped scheduling Mother as a patient due to Mother's "no call/no shows."

[¶30]   In addition, according to Ms. Meade, between March 2023 and July 2023, Mother failed to make the progress in counseling needed to comply with her DFS case plan, her

medications requirement, or her counseling/psychotherapy. Ms. Meade explained that at times Mother regressed, and for her to successfully manage her mental health conditions, she needed to comply with treatment and medication, and needed stable housing, and transportation.

[¶31] Although she was given flexibility in her choice of providers, Mother's inconsistency with counseling continued throughout the case. Mother later worked with other providers, including at the time of trial, but testimony revealed continued inconsistency and limited progress. Her case worker testified that Mother's consistent changing of counselors delayed her reunification with BAR.

[¶32] Mother also failed to secure safe, stable housing throughout the case. During the year after her release from jail in January 2023, Mother lived in at least five places, including transitional housing, three different boyfriends' residences, and a friend's home. Over the course of the entire neglect case, Mother estimated nine housing changes.

[¶33] Mother's moves were frequently dictated by her unstable relationship status. Although the Department encouraged her to live alone, Mother lived with four different men during the pendency of her neglect case, often moving in shortly after meeting them and moving out soon thereafter. Some of these relationships were marked by drug use or domestic violence. Mother testified one boyfriend, John Cordray, used marijuana and delta-8 while they lived together. Mother began using delta-8 while she was in a relationship with Mr. Cordray. Mother was also convicted of domestic battery against Mr. Cordray in 2023, leading to her serving two weeks in jail. A platonic roommate, Moroni Toone, used methamphetamine during their two-month stint living together. Even with the March 2025 permanency hearing close on the horizon, Mother could not maintain stable housing. A few months prior, she ended her relationship with one boyfriend and, a week later, moved in with another boyfriend. According to one Department case worker, Lori Yeigh, Mother was never able to start in-home visits with BAR because of her fluid living arrangements.

[¶34] Mother's efforts with BAR were similarly inconsistent. While in jail, Mother declined the Department's offer for video visitation, resulting in five months of no contact between Mother and BAR. The district court noted significant concern with Mother's decision in this regard, stating, "that's not how a fit and responsible and capable parent responds. You're in custody for five months, that's a horrible thing; and during that time, the idea that any fit parent would say, well, you know, it's better not to, it's better not to during these months for her is unacceptable to the Court." After her release, she inconsistently appeared for supervised visitation. The inconsistency was so significant that the facility coordinating visitation eventually placed Mother on a "time contract," requiring her to arrive early for appointments to ensure her attendance and avoid disruptions to BAR's schedule if Mother failed to appear. Notably, BAR's counselor never recommended unsupervised or therapeutic visitation because Mother failed to make

sufficient progress. Instead, she recommended reducing visitation because the inconsistent visits were harmful to BAR.

[¶35] Mother's participation in visitations also depended on her romantic relationships. Specifically, when she was in a relationship that was going well, she would typically attend visitation; when she was in a relationship that was not going well, Mother would miss visits. A log of visits entered into evidence showed that from February 2023 to mid-April 2024, fifty-one visits were canceled, mostly by Mother, and Mother had six additional "no call/no shows." By the time of her permanency hearing, Mother had missed approximately twenty-five percent of her visits with BAR, including a "no call/no show" absence the day before the hearing.

[¶36] Finally, Mother's substance abuse permeated the entire case. Despite services from the Department, the Drug Court Program, and treatment referrals, Mother did not achieve sustained sobriety. She admitted to using methamphetamine while supervising multiple children at the outset of the case, used marijuana during BAR's open juvenile case, tested positive for THC at least twenty-five times, and repeatedly failed to appear for UAs, missing approximately twenty percent of her appointments. Her termination from the Drug Court Program reflects a lack of progress even under the structure of an intensive program. Mother's substance abuse was a direct safety risk to BAR and remained unresolved for more than two years.

[¶37] Mother argues the evidence presented at trial did not establish she was unfit to parent BAR at that time. She asserts that by the time of trial she had made improvements in her life and was capable of meeting BAR's physical, mental, and emotional needs. She also claims she had obtained housing, employment, and transportation; had achieved sobriety; and was attending counseling.

[¶38] It appears that by the time of trial Mother had made some rehabilitative strides, including following through with counseling, securing a vehicle, and maintaining employment for over nine months prior to trial. However, after a careful review of the record, and viewing the evidence in the light most favorable to the Department while disregarding Mother's conflicting evidence, we conclude clear and convincing evidence supports the district court's determination that Mother was unfit. Temporary or recent improvements do not outweigh a long history of instability. *See In re AD,* 2007 WY 23, ¶ 29, 151 P.3d 1102, 1109 (Wyo. 2007) (stating the fact that a mother had stable housing for a short time before a hearing was insufficient to override a long history of multiple inappropriate homes). In addition, and while parents have a fundamental right to raise their children, children have a right to stability and permanency in their family relationships. *In re AD,* ¶ 31, 151 P.3d at 1109-10. Children cannot wait indefinitely for parents to achieve stability. Here, the district court, after hearing testimony from Department case workers, law enforcement, counselors, and Mother, found Mother unfit based on numerous factors.

The evidence sufficiently supports the district court's decision to terminate Mother's parental rights to BAR.

## CONCLUSION

[¶39] The Department presented sufficient evidence for the district court to terminate Mother's parental rights to BAR under Wyo. Stat. § 14-2-309(a)(v).

[¶40] Affirmed.